**Elizabeth SOBOL, Plaintiff,**

v.

**KIDDER, PEABODY & CO.,
INC. Defendant.**

**Nos. 91 CIV. 8740(SAS), 92
CIV. 3938(SAS) and 92
CIV. 3939(SAS).**

United States District Court,
S.D. New York.

Feb. 24, 1999.

---

Jeffrey Liddle, Christopher Panarella, Liddle & Robinson, L.L.P., New York City, for Plaintiff.

Mark Dichter, Rene Johnson, New York City, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff, Elizabeth Sobol, claims that defendant, Kidder, Peabody & Co. ("Kidder Peabody") violated the federal Equal Pay Act, 29 U.S.C. § 206(d)(1) ("EPA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2, et seq. ("Title VII"), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(e)(1). Plaintiff also alleges that Kidder Peabody violated the following state and local statutes: New York Labor Law § 194 (New York State's Equal Pay Act), New York Executive Law § 296 and the New York City Human Rights Law ("NYCHRL") § 8–107.

In March 1992, Sobol and Kidder Peabody executed a Stipulation and Order to arbitrate her claims before the National Association of Securities Dealers ("NASD").[1] Sobol reserved her right to appeal the arbitrability of this case and her right to appeal the arbitration award. *See* Affidavit of Jeffrey Liddle, counsel for plaintiff, dated September 30, 1998 ("Liddle Aff."), Ex. G.

Sobol's NASD arbitration consisted of 62 hearing sessions conducted between October 1994 and May 1998.[2] The arbitration panel was chaired by Kenneth Cutler, then general counsel of Lord, Abbett & Co. James Madan and Jerome Levy, both full-time arbitrators who had retired from management positions at Norton–Simon, Inc. and Goldman Sachs respectively, were the two other members of the panel. Both Sobol and Kidder Peabody submitted post-hearing briefs. *See* briefs attached to Liddle Aff., Ex. E and Affidavit of Rene Johnson, counsel for defendant, dated November 17, 1998 ("Johnson Aff."), Ex. A.

On July 7, 1998, the panel dismissed Sobol's claims in their entirety and divided the $50,400 in forum fees between the parties, assessing $25,650 against Sobol and $24,750 against Kidder Peabody. Kidder Peabody now moves to confirm the arbitration award rendered in its favor. Plaintiff, in turn, seeks to vacate the award and the panel's assessment of forum fees.

## I. Background

### A. Sobol's Tenure at Kidder Peabody

Sobol joined Kidder Peabody in 1981 as a member of its Utility Finance Department.[3] She became the managing director of the Department in 1987 and its head in 1988. Under her leadership, the Department increased its revenue between 1988 and 1990.[4] In 1988, Sobol completed the Utah Power & Light deal, generating revenues of $7.5 million, which was, at that time, the largest merger and acquisition transaction ever completed in the utilities industry. *See* Liddle Aff., Ex. A, SA 560. Sobol was the highest compensated female at the firm throughout her tenure.[5]

---

1. Sobol initially commenced three actions against Kidder Peabody in federal court which were consolidated before Judge Leval. However, Sobol was required to proceed in arbitration before the NASD pursuant to the Supreme Court's decision in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (holding that employees could be required under mandatory securities registration form to arbitrate claims brought under ADEA). The NASD is a self-regulatory association of securities firms, operating under the oversight of the federal Securities and Exchange Commission.

2. *Elizabeth Sobol v. Kidder, Peabody & Co., Inc.*, NASD Arb. No. 92–04152.

3. Sobol executed a standard securities industry pre-dispute arbitration agreement known as a "U–4 Form".

4. Sobol estimates that she produced revenues of $2,963,000 in 1985, $2,140,000 in 1986, $1,785,000 in 1987, $8 million in 1988 (not including revenue from the Utah Power deal), $9 million in 1989, and $15 million in 1990. *See* Liddle Aff., Ex. A, SA 560, 686–687. ("SA" numbers indicate the bates-stamped exhibits submitted by plaintiff).

5. Sobol's earnings were approximately $300,000 in 1985, $375,000 in 1986, $405,000 in 1987, $700,000 in 1988, $720,000 in 1989, $820,000 in 1990, and $62,500 in 1991 (base salary until her resignation). *See* Liddle Aff., Ex. C, SA 4393.

Sobol alleges that she was forced to resign in March 1991, at age 46, because Scott Newquist, head of the Investment Banking Department and her supervisor, made her life unbearable. According to Sobol, Newquist belittled her abilities, undermined her authority, threatened to remove her as head of the Utility Group or to appoint a co-head. Prior to her resignation, Sobol never complained of sex or age discrimination, nor of unequal pay. *See* Johnson Aff., Vol. II, Arbitration Transcripts: Newquist, 2400; Mike Madden, Head of Investment Banking, 1662; Granville Bowie, Head of Human Resources, 1048; and Michael Carpenter, Chief Executive Officer ("CEO"), 1798. After her resignation, Sobol and Kidder Peabody attempted to negotiate an agreement to permit Sobol to remain with the firm as a consultant. *See id.:* Sobol, 3812.

## B. Evidence of Pay Disparities

### 1. By Sex

During the arbitration, the panel heard evidence of gender-based pay disparities between 1985 and 1991. Sobol compared her pay to the higher compensation of other heads of departments and investment bankers.[6] Sobol also offered evidence of unequal pay on an institutional level. Sobol was the only female single-head of an industry group within the investment banking department. Apparently, all other females heading industry groups shared their authority with a male

co-head. *See* Liddle Aff., Ex. A, SA 1435–1437. Michael Carpenter, who became CEO in January 1989, testified that co-head positions were created in situations when "you had two very senior people of equal stature" or "where you had two individuals, one of whom was better at administering, and the other one was better at new business." *Id.* Ex. B., SA 2019. In all situations in which a male and female co-headed an industry group, the male was compensated more than the female.[7] Within the pool of "managing directors", the percentage by which male compensation exceeded female compensation varied from 3% to as much as 55% between the years 1985 and 1991. *See id.,* Ex. A, SA 1306–1314; Ex. C. SA 4396.

### 2. By Age

When age is taken into account in examining the pool of managing directors, the percentage by which compensation of males under 40 exceeds compensation of females over 40 varied from 20% to as much as 174% between 1985 and 1991.[8] *See id.,* SA 1315–1323; Ex. C, SA 4395. Sobol presented evidence indicating that Kidder Peabody took into account employees' ages when conducting the firm's annual Organization and Staffing Reviews for its corporate parent, the General Electric Company. One document entitled "High Potential Future Business Leaders" lists the names, ages, positions, and long term potential for approximately twenty execu-

---

6. For example, F.J. Megargal, head of the Mergers & Acquisitions ("M & A") Group received $3.2 million in 1989, $3,125,000 in 1990, and $3,350,000 in 1991. *See* Liddle Aff., Ex. A, SA 579, 567, 562. Gary Blemaster, head of the Media and Telecommunications Group received $1,350,000 in 1989 and $1.1 million in 1990. *See id.* at SA 577, 566. Les Lieberman, an investment banker with no group head responsibilities, received $1.8 million in 1989, $1,150,000 in 1990 and $2,250,000 in 1991. *See id.* at SA 578, 567, 562. Anthony Magro, another investment banker with no group head responsibilities, earned $1,200,000 in 1989 and $1,375,000 in 1990. *See id.* at SA 579, 567.

7. For example, in 1990, Errol Glasser and Carol Hance co-headed the Retail Group earning $700,000 and $250,000 respectively. *See* Liddle Aff., Ex. A, SA 566. In 1991, Brooks Klimley and Nancy Quinn ran the Natural Resources Group together, earning $1,850,000 and $525,000 respectively. *See id.* at SA 561, 563.

8. In 1988, Sobol was the only female managing director over 40. In 1989 and 1990, she was one of two female managing directors over 40; and in 1991, she was one of three females over age 40. *See* Liddle Aff., Ex. A, SA 1315–1323. It may be that the sample size of female bankers over 40 is insufficient to support an inference of discrimination.

tives. *See id.*, Ex. C, SA 4409. A second document, entitled "1989 Key Talent" lists the names, titles, ages and miscellaneous comments regarding approximately twenty-five managing directors and vice presidents. *See id.*, SA 4409. The comments state that Sobol is: "[s]olid, productive—not a large component manager." A 35 year-old managing director is described as a "[g]ood *young* banker"; a 31 year-old senior vice president is a "[s]trong *young* banker"; a 34 year-old vice president is a "very talented *young* banker"; and a 29 year-old vice president is described as "bright *young* high potential". *Id.*, SA 4410 (emphasis added). A third document lists the names, ages, titles and comments on the long term potential of "High Contribution Women." Sobol, one of the five women listed, is described as an "[e]ffective banker in male-dominated Utility industry. Not an effective manager; no strong desire to manage vs. produce. No significant managerial growth potential." *Id.*, SA 4412.

### 3. Kidder Peabody's Compensation Rationale

Kidder Peabody never undertook a wage-parity study regarding age or sex. *See id.*, Ex. B., SA 2177, 2493, 2562. In its defense, Kidder Peabody explains that its compensation is highly individualized. A multitude of factors other than job title or rank justify the pay differences between Sobol and her male counterparts, including profitability, market value, revenue generation, client relationships, product development abilities, product knowledge, leadership abilities and corporate citizenship. *See* Defendant's Memorandum of Law in Opposition to Plaintiff's Cross–Motion to Vacate Arbitration Award ("Def's.Mem.") at 5. For example, compensation depended, in large part, on the market value of each specialty group. Kidder Peabody characterizes Sobol's Utility group as "a relatively slow-paced, unprofitable industry group," while other groups such as Media, Environmental, Restructuring, and M & A were "busier and more profitable."

*See* Johnson Aff., Vol. II: Blemaster, 6109, 6129–30; Newquist, 2153–54, 2256, 5379, 5383–86, 5394–97; Douglas Tansill, investment banker, 6038; Carpenter, 6340, 6343; Madden 1587–88.

In addition, compensation was related to profitability—M & A deals were highly profitable, utility deals tended to be "loss leaders and unprofitable." *Id.*: Madden, 5131; Blemaster, 6123–33; Newquist, 5469, 5836–37. Kidder Peabody maintains that during Sobol's tenure, the Utility Group's profitability was sluggish; it lost market share and prestige. *See id.*: Carpenter, 1822–23, 6343; Newquist, 2414–17, 5443–44; Madden, 5182. Other factors also led to differences in pay between individual investment bankers. A period of unprofitability in 1988 and 1989, followed by the resignation of many talented investment bankers compelled Kidder Peabody to offer attractive multi-year compensation packages to attract new talent. *See id.*: Newquist, 2270–74; Carpenter, 1800.

### C. Sobol's Resignation

Sobol alleges that she was forced to resign by Scott Newquist's "humiliating threats" to appoint a co-head to lead her Group.

> I felt that my relationship with [Newquist] had deteriorated so badly that my future position at the firm would be so awful that my position and my department was very much at question, that I felt I had to resign at that point. I didn't think I had a choice .... I had already been told my all-in compensation would be reduced significantly; I felt ... my position at the firm was deteriorating rapidly.

Liddle Aff., Ex. B, SA 3145.

Sobol had complained many times to Nancy Quinn, co-head of the Natural Resources Group, of Newquist's lack of support and his attempts to undermine her efforts as head of the Utility Group. *See id.*, SA 3515. Quinn characterized Newquist as having a "very combative style of

management." *Id.* According to Don Campbell, an investment banker in the Utilities Group, Newquist "wanted to appear to be very much in control." *Id.,* SA 3557. Newquist was "very combative, very clipped, very curt"; a "difficult personality" who "if you showed any sign of weakness to him he was at your throat." *Id.* Gary Blemaster testified that Sobol "had a very stressful relationship with Scott that contributed to her unhappiness." *Id.,* SA 4062.

Newquist excluded Sobol from departmental committees. *See id.,* SA 2953. When Sobol asked Newquist why he would not allow her to participate on several committees, he responded that she was a "gossip" with no "vision of the business" and that she "always felt goddamn entitled." *Id.,* SA 3117.[9] Sobol charges that Newquist "went behind her back" to recruit a younger male, John Cavalier, to replace her. Cavalier interviewed at the firm with Sobol and others in the Utility Group for a managing director position under Sobol's supervision. Later, at a weekend meeting at Newquist's home (which Sobol did not attend), Newquist informed Cavalier that he would be compensated "$900,000 annually for two years . . . and [Cavalier] was not to share any information regarding that compensation with Liz [Sobol], and that . . . over the course of a period . . . being a year, [Cavalier] would serve as co-head and eventually . . . would have the opportunity to head the group." *Id.,* SA 3005–3006.

Kidder Peabody characterized Sobol as uncomfortable with her managerial role, "insecure" in dealing with her staff, requiring an excessive amount of reassurance and "hand-holding" by upper management, "high-stress", and "emotional". Johnson Aff., Vol. II: Madden 1578, 5164–66; Bow-

ie, 1162–63; Blemaster, 6146; Carpenter, 1897–98, 6305, 6310. Newquist maintains that his decision to hire a co-head for Sobol's group was motivated in part by his concern for Sobol's management abilities and by his desire to hire significant revenue generators for the Group. *See id.,* Newquist 5331–33. Prior to her resignation, Sobol sought Newquist's assurance that he would not appoint a co-head. Newquist declined to provide this assurance. *See id.:* Sobol, 4455–57; Newquist, 2135–36.

### D. Panel's Decision

After both sides had presented evidence and submitted their post-hearing briefs, the panel decided all claims in defendant's favor. Aside from a six page summary of the arbitration proceedings provided by NASD staff attorneys, there was no written opinion providing the panel's findings of fact or conclusions of law. *See* Liddle Aff. Ex. F.

### II. Legal Standard

■■■ Review of arbitration awards are generally governed by the Federal Arbitration Act (the "FAA").[10] In addition, the Second Circuit has recognized that an arbitration award may be vacated if it is in "manifest disregard of the law." *Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 202 (2d Cir.1998); *Wilko v. Swan,* 346 U.S. 427, 436–37, 74 S.Ct. 182, 98 L.Ed. 168 (1953), *overruled on other grounds in Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). The "manifest disregard" test is rigorous. It requires "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply

---

9. Sobol interpreted these comments as sexist. In addition, Sobol took umbrage when Carpenter suggested that she needed a male co-head because he felt a lot of business was still conducted in "duck blinds and at bars." Liddle Aff., Ex. B., SA 3199.

10. The FAA provides that an award may be vacated if: (1) the award was procured by corruption, fraud or undue means; (2) the arbitrators exhibited "evident partiality" or "corruption"; (3) the arbitrators were guilty of misconduct; or (4) the arbitrators exceeded their power. *See* 9 U.S.C. § 10(a).

the law." *Siegel v. Titan Indus. Corp.*, 779 F.2d 891, 892 (2d Cir.1985). To modify or vacate an award on this ground, a court must find that: "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Halligan*, 148 F.3d at 202 (citing *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 821 (2d Cir. 1997)). However, a court may not review the weight the arbitration panel accorded to conflicting evidence. *See Chisolm v. Kidder, Peabody*, 966 F.Supp. 218, 229 (S.D.N.Y.1997), *aff'd*, No. 97–7828, 1998 WL 695041 (2d Cir.1998).[11]

## III. Discussion

### A. Validity of Pre–Dispute Arbitration Agreement

Sobol challenges the validity of her NASD U–4 Form pre-dispute arbitration agreement. In 1991, the Supreme Court upheld the legality of a mandatory pre-dispute arbitration provision in a New York Stock Exchange ("NYSE") U–4 Form to require the arbitration of plaintiff's ADEA claim. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). In *Gilmer*, the plaintiff argued that the arbitration process and panel were biased and that the procedures were inadequate. The

Court rejected this contention, holding that the NYSE arbitration rules sufficiently protected against biased panels and insured adequate resolution of the plaintiff's substantive rights outside of a judicial forum. *See id.* at 28–31, 111 S.Ct. 1647. The Court also rejected the argument that inequities in bargaining power between employers and employees justify holding arbitration agreements unenforceable. *See id.* at 28–30, 33, 111 S.Ct. 1647.

*Gilmer* was decided on May 13, 1991. At that time, Title VII contained no mention of arbitration. Subsequently, the 1991 Amendments to the Civil Rights Act ("CRA") encouraged the use of arbitration.[12]

> Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal Law amended by this title.

Civil Rights Act of 1991, Pub.L. 102–166 § 118, 105 Stat. 1071, 1081 (1991). Since the 1991 Amendments, several courts have struggled to interpret Congressional intent regarding arbitration of employment discrimination claims. Indeed, courts within this Circuit have expressed doubt as to whether mandatory pre-dispute arbitration agreements are valid as applied to such claims.[13] In addition, both the NASD and

---

**11.** The D.C. Circuit has held that district courts should review arbitral awards in employment discrimination cases with sufficient rigor to ensure that the arbitrators properly interpreted and applied statutory law. *See Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1487–88 (D.C.Cir.1997). Similarly, one district court in this Circuit has recognized that "[a]n argument can be made that the Circuit needs to create an enhanced standard [of judicial review] for employment discrimination claims." *Chisolm*, 966 F.Supp. at 227.

**12.** Congress drafted the CRA prior to the Supreme Court's decision in *Gilmer*. However, the legislation was enacted on November 21, 1991, five months after *Gilmer*.

**13.** For example, the Second Circuit has noted the "growing concern" expressed by federal

courts over mandatory arbitration of employment discrimination claims. *See Halligan*, 148 F.3d at 201; *see also Martens v. Smith Barney*, 181 F.R.D. 243, 255–256 (S.D.N.Y. 1998) (analyzing extent to which Congress intended that Title VII rights be alienable in prospective agreements to arbitrate claims in securities dealer class action). *See also, Phillips v. CIGNA Investments, Inc.,* 27 F.Supp.2d 345 (D.Conn.1998) (arbitration policy of non-securities industry employer not enforceable under FAA as to employment discrimination claims).

However, numerous circuits have upheld the validity of pre-dispute agreements to arbitrate claims in the employment discrimination context. *See, e.g., Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465 (D.C.Cir.1997); *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith,*

the NYSE have recently proposed rule changes that would no longer require mandatory pre-dispute arbitration agreements.[14]

The Ninth Circuit was the first appellate court to address the issue of whether Congress intended to ban pre-dispute arbitration agreements when it passed the 1991 CRA. Analyzing the language and legislative history of § 118 of the 1991 Act, the Ninth Circuit held that Congress intended to preclude the compulsory arbitration of civil rights claims. *See Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182 (9th Cir.1998) (rendering unenforceable a U–4 form signed by a securities broker).

The Second Circuit has not yet ruled on the precise issue considered by the Ninth Circuit in *Duffield.* But even if it were to agree with the reasoning of *Duffield,* the question arises whether the 1991 CRA may be applied retroactively to Sobol's claims which arose prior to her resignation from Kidder Peabody in March 1991.[15]

I need not address the retroactivity issue here, however, because regardless of its outcome, Sobol's argument fails. If the 1991 CRA is not retroactively applied to Sobol's claims, the Supreme Court's decision in *Gilmer* would control, rendering Sobol's U–4 agreement valid and enforceable. On the other hand, if the 1991 CRA were to apply retroactively to Sobol's claims, I would reject the Ninth Circuit's interpretation of the 1991 CRA. Therefore, I conclude that Sobol's pre-dispute arbitration agreement is valid and enforceable.

## B. Sobol's Equal Pay Act Claim

In order to establish that the arbitrators acted in "manifest disregard" of the law, a reviewing court must find that: (1) The arbitrators knew of a governing legal principle, yet failed to apply it or ignored it altogether; and (2) the law ignored by the arbitrators was well-defined, explicit and clearly applicable to the case. *Halligan,* 148 F.3d, at 204. Here, the arbitrators were informed of the governing legal principle by Sobol's counsel during the arbitration and in her post-hearing brief. The legal principles governing state and federal equal pay laws are well-defined. Thus, the question which remains is whether, knowing the applicable legal standard, the panel failed to apply it or ignored it altogether. Sobol maintains that the overwhelming evidence of pay disparities proves that the panel must have ignored the applicable legal standard. Kidder Peabody argues that, on the contrary, given the evidence presented, Sobol failed to make out her prima facie case by identifying and proving that males were paid more to perform equal jobs requiring equal skill, equal effort and equal responsibility.

*Inc.*, 163 F.3d 53 (1st Cir.1998); *Seus v. John Nuveen & Co., Inc.*, 146 F.3d 175 (3rd Cir. 1998); *Austin v. Owens–Brockway Glass Container, Inc.*, 78 F.3d 875, 882 (4th Cir.1996); *Mouton v. Metropolitan Life Ins. Co.*, 147 F.3d 453 (5th Cir.1998); *Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305, 308, 312 (6th Cir.1991); *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997); *Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832, 837 (8th Cir.1997); *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482, 1487 (10th Cir.1994); *Paladino v. Avnet Computer Technologies, Inc.*, 134 F.3d 1054 (11th Cir.1998).

14. *See* Order Granting Approval to Proposed Rule Change Relating to the Arbitration of Employment Discrimination Claims, 63 Fed. Reg. 35299 (1998) (as of January 1, 1999, NASD member employers are no longer re-

quired to impose pre-dispute arbitration agreements on associated securities dealers); Notice of Filing of Proposed Rule Changes by New York Stock Exchange, Inc. Relating to Arbitration Rules, 63 Fed.Reg. 52782 (1998) (N.Y.SE has proposed that it would no longer make its arbitration system available to hear employment discrimination cases, unless the parties agree to arbitration *after* the dispute has arisen).

15. *See Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (provision of 1991 CRA creating right to recover compensatory and punitive damages, and providing for right to jury trial if plaintiff claims such damages, may not be applied retroactively to case pending on appeal when statute enacted).

### 1. Sobol's Prima Facie Case

In order to state a prima facie case of salary discrimination based on sex under the EPA, 29 U.S.C. § 206(d), a plaintiff must demonstrate that 1) the employer pays different wages to employees of the opposite sex; 2) the employees perform *equal* work on jobs requiring *equal* skill, effort, and responsibility; and 3) the jobs are performed under similar working conditions. *See Pollis v. The New School for Social Research*, 132 F.3d 115, 118 (2d Cir.1997) (emphasis added). A plaintiff need not demonstrate that her job is identical to a higher paid position, but only must show that the two positions are "substantially equal." *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d 'Cir.1995). However, jobs which are "merely comparable" are insufficient to satisfy a plaintiff's prima facie burden. *See id.*, 66 F.3d at 1310 (citing *Lambert v. Genesee Hospital*, 10 F.3d 46, 56 (2d Cir.1993)). Under the EPA, a plaintiff need not prove an employer intended to discriminate against her in order to prevail on her claim.[16] *See Pollis*, 132 F.3d at 118.

Sobol's comparisons of her salary to those of the average male with her job title fail to take into account several of the factors Kidder Peabody considers when developing compensation packages. "Application of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance." 29 C.F.R. § 1620.13(e) (1997). Sobol has not shown that the panel acted in manifest disregard of the law when it concluded that she had not proven that her work required equal skills, and entailed equal efforts and responsibilities as the bankers she selected as her "comparators".

Sobol's charts submitted to the arbitrators either do not identify her comparators or identify comparators who are managing directors or vice-presidents, without reference to their duties, efforts, and responsibilities. *See* charts at Liddle Aff. Ex. C, SA 4394–4397. Merely because their jobs carried the same title does not mean that they required the same skill. *See* 29 C.F.R. § 1620.13(e); *Stopka v. Alliance of American Insurers*, 141 F.3d 681, 685 (7th Cir.1998) (jobs not equal where female vice-president's job required administrative skills, not the substantive insurance skills required by the five male vice-presidents' job). The skills required of Sobol (calling on existing clients and generating revenue) were different than those required of, for example, the head of M & A who was required to be a product specialist with a high degree of expertise to assist with transactions, but not primarily to generate revenue. *See* Johnson Aff., Vol. II: Newquist, 2233–34; Carpenter, 6329. Some of the individuals to whom Sobol compares herself had different duties and responsibilities. For example, in 1989, Douglas Tansill managed all of Investment Banking, as well as an industry specialty group. In that same year, Gary Blemaster was acting head of the M & A Group, as well as head of the Media Group. Donald Gogel co-headed the very profitable Merchant Banking Group. And Douglas Brown, the firm's most senior M & A professional, handled all the firm's difficult assignments. *See id.*: Tansill, 5990; Carpenter, 6330–31; Blemaster, 6093–94; Bowie, 1100; Madden, 1584, 1634–35.

### 2. Employer's Justification for Any Disparities

Assuming, however, that Sobol had made out her prima facie case, the burden of persuasion would shift to Kidder Peabody to prove that the disparity is justified by one of four affirmative defenses: 1) a merit system; 2) a seniority sys-

---

**16.** Sobol speculates that the panel denied her EPA claim because it erroneously believed that discriminatory intent was a required element of the claim. However, plaintiff's counsel indicates that it repeatedly informed the arbitrators of the correct legal requirements of an EPA claim throughout the hearings. *See* Plaintiff's Memorandum in Support of Cross–Motion to Vacate Arbitration Award (Pl.'s Mem.) at 11.

tem; 3) a system which measures earnings by quantity or quality of production; 4) a differential based on any factor other than sex. 29 U.S.C. § 206(d)(1); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 196, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). An employer who attempts to justify a pay differential based on a "factor other than sex" must also prove that the genderneutral factor was adopted for a legitimate business reason. *See Aldrich v. Randolph Central School District*, 963 F.2d 520, 526–27 and n. 1 (2d Cir.1992).

Here, Kidder Peabody has introduced evidence of legitimate reasons for the pay differentials: (1) that performance and production justified certain pay decisions; and (2) that the firm paid a premium to attract and hire talented new bankers to rebuild its investment banking ranks after their depletion in 1989 and 1990.

### a. Rewarding Performance and Production

 A firm's practice of paying high revenue generators more than individuals who produce less does not violate the EPA. *See Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1364 (10th Cir.1997) (permissible to pay female assistant manager less than male assistant managers where female's department produced less than 10% of revenues produced by males' departments indicating that tasks and functions were dissimilar); *Byrd v. Ronayne*, 61 F.3d 1026, 1034 (1st Cir.1995) (affirming dismissal of discriminatory pay claims; fact that one attorney brought in substantially more clients and revenue than plaintiff afforded employer affirmative defense to Equal Pay Act claim). In her 1988 and 1989 calculations, Sobol compared herself to three senior M & A bankers who were considered extremely valuable assets to the firm because of their expertise and skills. As discussed above, the Utility Group's revenue production was sluggish during Sobol's tenure.

### b. Attracting New Hires to the Firm

 An employer may pay higher wages to a male than a female when it is necessary to do so in order to hire or retain an employee with particular desired skills. *See Horner v. Mary Inst.*, 613 F.2d 706, 714 (8th Cir.1980) (where a higher salary was paid to a male employee because his "experience and ability made him the best person available for the job and because a higher salary was necessary to hire him," the salary was based on a factor other than sex); *Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F.Supp. 667, 679 (S.D.N.Y.1995) (paying male associate more than female associate in order to keep him from joining another firm was lawful); *Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531, 1552 (S.D.N.Y.1986) ·(male employee's higher salary justified in part because he could not be induced into transferring without a salary match); *Walter v. KFGO Radio*, 518 F.Supp. 1309, 1318 (D.N.D.1981), (education, experience, and marketplace value of an individual's skills are relevant factors in determining an employee's starting salary, and if a higher salary is necessary to hire the best person to do the job, that ·consideration is a valid "factor other than sex").

Yet, Sobol compared her salary to those of several new bankers with hiring guarantees. For example, 13 of the 26 males to whom Sobol compares herself in 1990 obtained hiring guarantees. If these 13 individuals are not considered, the average compensation of male managing directors drops considerably from $662,186 to $472,-944, approximately $150,000 less than what Sobol earned that year. *See* Johnson Aff., Vol. II: Alan Wurzbach, Human Resources Manager for Investment Banking Unit, 4921–22; Liddle Aff., Ex. C, SA 4395–4396.

### 3. Absence of Panel's Written Opinion

 Sobol argues that the Court may draw an inference that the arbitrators de-

cided her claims in manifest disregard of the law from the "overwhelming" evidence of discrimination and the absence of a written opinion. In *Halligan*, the Second Circuit reversed an arbitration award denying relief to a petitioner who claimed he had been terminated in violation of the ADEA. *See* 148 F.3d at 204. Although the arbitrators had conducted extensive hearings and rendered a written award describing the claims and defenses, their writing did not contain any reasoning to support the result. Given the strong evidence that Halligan was fired because of his age,[17] the court was "inclined to hold that [the arbitrators] ignored the law or the evidence or both." *Id.* The fact that the arbitrators provided no explanation for their opinion supported the court's view that the award was rendered in manifest disregard of the facts and the law. While *Halligan* does "not hold[ ] that arbitrators should write opinions in every case or even in most cases," it stands for the proposition that where a court is inclined to find a manifest disregard of the law on the part of arbitrators, the court can infer from the absence of a written opinion that the arbitrators did not have a reasonable explanation for the award. *Id.*

▬▬▬ In the instant case, although the arbitrators failed to provide a written rationale for their decision, the facts presented do not amount to overwhelming evidence of discrimination as was the case in *Halligan*. Because I do not find a manifest disregard of the law on the part of the arbitrators, I draw no negative inference from the absence of a written opinion.

### 4. Conclusion

Based on the foregoing, plaintiff has not established that the arbitrators acted in "manifest disregard" of the law in denying her EPA claim. The arbitrators were informed of the governing law, which was well-defined and clearly applicable to the case. Moreover, plaintiff has not shown that the arbitrators ignored or failed to apply the law. The Second Circuit has cautioned that the reach of the "manifest disregard of the law" doctrine is "severely limited". *See Halligan*, 148 F.3d at 202 (quoting *Government of India v. Cargill, Inc.*, 867 F.2d 130, 133 (2d Cir.1989)). Sobol has not presented "overwhelming" evidence of discrimination. Kidder Peabody has offered "legitimate business reasons" for any pay disparity between Sobol and other heads of departments or investment bankers. Moreover, the court may not review the weight accorded to conflicting evidence by an arbitration panel. *See Chisolm*, 966 F.Supp. 218, *aff'd*, No. 97–7828, 1998 WL 695041 (2d Cir.1998). Even though the arbitrators did not explain the reasoning behind their decision, I am not persuaded that they ignored the applicable law. Therefore, the panel's award based on Sobol's equal pay claims is confirmed.

### C. Sobol's Constructive Discharge Claim

▬▬▬ Nevertheless, the Court may vacate the arbitration award should it find that the panel acted in manifest disregard of the law applicable to Sobol's constructive discharge claim.[18] In order to estab-

---

17. Halligan presented evidence of repeated discriminatory remarks by his superiors such as, "you're too old. Our clients are young and they want young salesmen." *Halligan*, 148 F.3d at 199. Several witnesses testified that company personnel expressed the intent to "put [Halligan] out to pasture because he was getting old" even though Halligan was one of the company's top salesmen and among the best in his field. *Id.*

18. Sobol also alleges discriminatory pay claims under Title VII and New York anti-

discrimination law. These claims, unlike the EPA, do require a showing of intentional discrimination. *See Pollis*, 132 F.3d at 123. During the arbitration, Sobol did not present sufficient evidence of intentional discrimination. The fact that Kidder Peabody never conducted a wage parity study for either sex or age does not constitute evidence of intentional discrimination. As discussed above, the wage disparity statistics presented by Sobol did not take into account many relevant factors involved in determining compensation. Thus, the Panel's decision to deny So-

lish a prima facie case of termination of employment in violation of the ADEA or Title VII, Sobol must show (1) that she was within a protected group (age or sex), (2) that she was qualified for the job, (3) that she was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of age or sex discrimination.[19] *See, e.g., Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360–61 (2d Cir.1993) (ADEA claim); *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180 (2d Cir.1992) (same standards of proof apply to Title VII and ADEA claims). A "discharge," in satisfaction of the third element of the prima facie case, may be either an actual termination of the plaintiff's employment by the employer or a "constructive" discharge. *See, e.g., Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983).

A constructive discharge occurs when the employer, rather than acting directly, " 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.' " *Pena,* 702 F.2d at 325 (quoting *Young v. Southwestern Savings and Loan Assn.,* 509 F.2d 140, 144 (5th Cir.1975)). In determining whether or not a constructive discharge has taken place, " 'the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " *Pena,* 702 F.2d at 325 (quoting *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977)).

Here, evidence presented by Sobol of Newquist's difficult personality and her stressful relationship with him does not rise to the level of "intolerable"

working conditions. The requirements of constructive discharge are not met when the evidence shows only that an employee was dissatisfied with her work assignment, or that her working conditions were difficult or unpleasant, or that she preferred not to work for a particular supervisor. *See Spence v. Maryland Casualty Co.,* 995 F.2d 1147, 1156 (2d Cir.1993). Moreover, Sobol has failed to prove that Newquist or Kidder Peabody *deliberately* created an intolerable environment because of Sobol's sex or age. *See Stetson,* 995 F.2d at 359–60.

Sobol cites Newquist's desire to appoint a co-head to lead her group as well as his refusal to appoint her to firm committees as reasons for her resignation. However, constructive discharge is not established simply through evidence that an employee is dissatisfied with the nature of her job assignments. *See Stetson,* 995 F.2d at 360; *see also Pena,* 702 F.2d at 325. Moreover, although Sobol states that Newquist's desire to hire a co-head compelled her to resign, she was aware of his intentions for two years prior to her resignation and even assisted in interviewing potential candidates for the position. In addition, the fact that Sobol negotiated for a consulting position with Kidder after her resignation indicates that her working conditions were not intolerable.

Based on the foregoing, the panel's decision to deny Sobol's constructive discharge claims was not in manifest disregard of the law. The arbitrators were informed of the legal principles governing constructive discharge. Unlike the plaintiff in *Halligan,* Sobol has not presented overwhelming evidence of discrimination to justify a finding of manifest disregard of the law or the

bol's claims of discriminatory pay under Title VII and the New York anti-discrimination law was not in manifest disregard of the law. In addition, the only evidence offered regarding defendant's consideration of age were documents generated during the firm's Organizational and Staffing Review which listed the ages and future potential of several employ-

ees. As with her claims based on sex, Sobol has failed to link these references to age to any pay disparity.

19. Sobol's state-law HRL claim is governed by the same standards as her federal claim. *See, e.g., Tomka,* 66 F.3d at 1304 n. 4.

evidence by the panel pertaining to her constructive discharge claims.

### D. Plaintiff's Allegations of Panel Bias and Procedural Misconduct

#### 1. Panel Bias

Citing the arbitrators' professional backgrounds and their track record of awarding low damages, Sobol charges that the panel was biased against her.[20] Indeed, the NASD has been criticized for its partiality towards member firms in the selection of arbitration panels. *See, e.g.,* Daily Labor Rep. (BNA) No. 93, at A–3 (May 14, 1996); *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith,* 995 F.Supp. 190, 206–212 (D.Mass.1998)(refusing to compel arbitration of Title VII sex discrimination claim, in part, because of institutional bias due to industry influence over arbitration at self regulatory organizations). However, the Second Circuit recently has rejected charges of arbitral bias that were raised after the rendering of an unfavorable award. *See York Research Corp. v. Landgarten,* 927 F.2d 119, 122 (2d Cir.1991).

Sobol raised a peremptory challenge to Chairman Cutler's appointment two and a half months after the NASD deadline to raise such a challenge. The parties were notified of Cutler's selection on December 15, 1993. Pursuant to Section 22 of the NASD Code of Arbitration Procedure, a party has five business days from the date she is notified of the identity of the arbitrator to exercise a peremptory challenge. Plaintiff did not notify the NASD of her intention to exercise her peremptory challenge until March 3, 1994. *See* correspondence from Maria Campese Diglio, NASD Staff Attorney to Jeffrey Liddle, dated March 3, 1994, Johnson Aff., Ex. E. At no time did Sobol challenge the selection of Levy or Madan.

In any event, even if Sobol's challenge to the partiality of the panel members had been timely, it would not have risen to the level of "evident partiality" required by the FAA to vacate an award. 9 U.S.C. § 10(b). "Evident partiality" involves more than just the "appearance of bias." *Local 814, Int'l Bhd. of Teamsters v. J & B Systems,* 878 F.2d 38, 40 (2d Cir.1989). It does not, however, require proof of actual bias. *Id.* "Evident partiality" exists "where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Id.*

Sobol speculates that Cutler could not have been impartial because as former general counsel to Lord, Abbett & Co. he undoubtedly defended the firm against employment-related matters. Similarly, Sobol merely speculates that Levy and Madan's damages record is indicative of bias against plaintiffs. This speculation does not rise to the level of "evident partiality."

#### 2. Alleged Procedural Misconduct

In addition, Sobol complains of the limited scope of pre-hearing discovery. However, the NASD Code of Arbitration specifically limits the discovery available to the parties. Misconduct warranting vacatur pursuant to § 10(a) of the FAA must be serious; it "must amount to a denial of fundamental fairness of the arbitration proceeding." *Areca, Inc. v. Oppenheimer & Co., Inc.,* 960 F.Supp. 52, 54–55 (S.D.N.Y.1997) (citations omitted) (arbitrators' refusal to allow investors to present testimony of brokerage firm's chief financial officer was not "misconduct" warranting vacatur of arbitration award). Sobol has presented no evidence to justify this Court's vacatur of the arbitration award based on procedural misconduct.

---

**20.** According to plaintiff, James Madan's and Jerome Levy's average ratio of damages awarded to those requested in prior arbitrations was approximately 5%. Plaintiff cites, but does not provide to the Court, a General Accounting Office report dated May 11, 1992, which found that the average ratio of damages awarded to those requested by NASD arbitrators was 64% and 52% for NYSE arbitrators.

### E. Arbitration Fee Award

The arbitration panel, relying upon NASD Rule 10205(c), assessed Sobol $24,650 in forum fees. The NASD Regulation Code of Arbitration Procedure states in relevant part: "The arbitrators in their award, shall determine the amount chargeable to the parties as forum fees and shall determine who shall pay such forum fees." *See* NASD Code of Arbitration Procedure Rule 10205(c). In some securities industry arbitrations, unsuccessful plaintiffs have been required to shoulder substantial forum fees in addition to paying their attorney's fees. *See* New York Stock Exchange arbitration decision in *Barbara A. Wolfe v. Charles R. Schwab*, NYSE Arbitration Docket No. 1993–003197 (Aug. 19, 1994) (claimant pursued an unsuccessful sex discrimination allegation and was assessed one-half of $82,800 in forum fees for 55 hearing sessions and one discovery conference).

Nevertheless, Sobol contends that the assessment of forum fees against her violates public policy by discouraging arbitration. Sobol cites a D.C. Circuit case holding, in the context of statutory discrimination claims, that employees cannot be required to pay arbitration fees when employers insist that employees agree to mandatory arbitration. *See Cole v. Burns Int'l Security Servs.*, 105 F.3d 1465, 1468 (D.C.Cir.1997). *Cole* held that an employer may not force an employee to sign a pre-dispute arbitration agreement and also require the employee to pay all or part of the arbitrators' fees. *Id.* at 1467–68 & n. 1. However, *Cole* is distinguishable from the instant case. Cole was not a securities industry employee; he did not sign a U–4 agreement. Rather, he signed a contract giving his employer the right to compel arbitration before the American Arbitration Association. *Id.* at 1469, 1481 & n. 8. To uphold the validity of the arbitration agreement, the court interpreted the agreement to require the employer to pay the arbitrators' fees. *Id.* at 1485–86. Given that the sharing of forum fees is authorized by NASD rules, and that arbitration is generally less expensive than litigation, the assessment of half of the forum fees against Sobol will neither discourage arbitration nor offend public policy.

### IV. Conclusion

For the foregoing reasons, defendant's motion to confirm the NASD panel arbitration award is granted. Plaintiff's motion to vacate the $25,650 arbitration fee assessed against her is denied.

SO ORDERED: