**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 8 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ANDREW ANGOVE,

      Plaintiff-Appellant,

v.

WILLIAMS-SONOMA, INC., a
California corporation; KELLY
BOYNTON, an individual,

      Defendants-Appellees.

No. 02-5079

(D.C. No. 01-CV-34-E)

(N.D. Oklahoma)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE** and **McWILLIAMS**, Circuit Judges, and **BRORBY**, Senior Circuit
Judge.

---

      Andrew Angove filed this action against Williams-Sonoma, Incorporated (WSI),

and Kelly Boynton, alleging sexual discrimination in violation of 42 U.S.C. § 2000e-5,

violation of 29 U.S.C. § 206 and Okla. Stat. Ann. tit. 25, § 1302 by paying Angove at a

rate lower than that paid to a female in the same position, defamation, and tortious

interference with an employment relationship. Angove appeals the district court's order

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

granting defendants' motion for summary judgment. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I.

Angove was hired by WSI in 1991 as a seasonal associate in its Tulsa store. Upon accepting employment, Angove received WSI's "Associate Handbook" and signed an "Employment Understanding," in which he acknowledged that his employment could be terminated with or without cause, and with or without notice, at any time, at either his or WSI's option. Angove worked as a sales associate at the Tulsa store until September 1993, when he was promoted to the position of store manager at WSI's Denver store. In April 1995, Angove was named store manager for WSI's Tulsa store, which was considered a promotion.

Boynton, district manager of the Dallas District, was Angove's immediate supervisor. As Angove's supervisor, Boynton evaluated his job performance and prepared annual performance appraisals. Angove generally received a "Meets Expectations" rating, although his evaluations also identified specified areas that needed improvement. He never complained to Boynton or anyone at WSI about his performance evaluations. He twice received WSI's "People First" award, given in recognition of managers considered role models for their employees.

Despite generally favorable reviews, Angove was counseled on several occasions regarding his job performance. In November 1998, Boynton suggested that Angove

should strive to maintain a positive and professional attitude and "exude a positive, knowledgeable, and professional demeanor." Aplt. App. I at 5. In April 1999, Walter Helmerich, the owner of the shopping center where WSI's Tulsa store was located, told Howard Lester, then WSI's chief executive officer, that Angove had an extremely negative personality and that his employees had adopted the same attitude. Several days later, Boynton wrote a performance appraisal action plan imploring Angove to maintain a positive and professional demeanor at all times. In June 1999, Boynton noted that Angove displayed a professional attitude, but tended to use a tone of voice that was "negative" and "snooty." Id.

In July 1999, Boynton issued a written warning to Angove regarding his job performance, especially in the areas of leadership, results, and interpersonal skills. The warning encouraged Angove to maintain a positive and professional demeanor at all times and to become more approachable and adaptable in his management style. Boynton warned that, if these goals were not met, Angove would be subject to various disciplinary actions, including termination. Boynton indicated this warning was issued as a result of complaints from Angove's staff that he was often absent from the sales floor, had a negative method of communicating with employees and customers, and failed to complete displays in a timely manner.

On January 10, 2000, WSI terminated Angove for inappropriate conduct toward a subordinate employee, Preston Allen. Allen complained that Angove had left harassing

telephone voice messages for him. Allen, who was a shipper/receiver in WSI's Tulsa store, called to report that he was sick in mid-December and the store's assistant manager, Tod Neumann, approved his requested sick leave. Angove apparently did not agree with Neumann's decision. Angove's first voice message to Allen stated that if Allen was actually sick, he should visit a doctor, take the necessary medications, and report for work on Saturday and Sunday (the following two days) because there were a lot of shipments to be completed. Allen was surprised at this message because he was not scheduled to work that weekend and he had available sick leave. In the second voice message, Angove noted that he had not yet heard from Allen despite the earlier message. In the third voice message, Angove stated that he assumed Allen had abandoned his job since he had not contacted the store, and, if Allen failed to report for work the next day, he would be terminated. Allen advised Boynton that he had called the store on four different occasions to report his absences and that, in addition to his sickness, his mother and sister had been seriously injured in an automobile accident. Boynton listened to the voice messages, and also learned through inquiries that other employees at the store could have performed Allen's job.

Boynton reported the results of her investigation to her direct supervisor, Pat Hays, WSI's regional manager, Lori Salbenblatt Spence, WSI's human resources manager, and Mary Herald, WSI's vice-president of stores. Herald concluded that Angove's behavior was unacceptable and that Angove should be terminated, and Spence, Hays, and Boynton

4

agreed.  At no time was Angove's gender discussed or mentioned as a factor in WSI's decision to terminate his employment.

Angove filed his complaint on January 12, 2001, alleging sexual discrimination in violation of 42 U.S.C. § 2000e-5, violation of 29 U.S.C. § 206 and Okla. Stat. Ann. tit. 25, § 1302 by paying Angove at a rate lower than that paid to a female in the same position, defamation, and tortious interference with an employment relationship.  The district court granted defendants' motion for summary judgment.  With respect to Angove's gender discrimination claim, the district court set forth the reverse discrimination framework, as modified by <u>Notari v. Denver Water Dep't</u>, 971 F.2d 585 (10th Cir. 1992), concluded that Angove had failed to set forth a prima facie case of intentional reverse discrimination based upon gender, and alternatively stated that Angove failed to produce evidence suggesting it was pretextual.  As to Angove's Equal Pay Act (EPA) claim, the court assumed, for purposes of summary judgment, that plaintiff had stated a prima facie case, but concluded the uncontroverted facts established that the identified wage disparity was based on factors other than gender.  The court further concluded that no publication of the alleged falsehood occurred.  Finally, the court concluded that Angove had not produced any evidence that Boynton acted in bad faith.

II.

We review a district court's grant of a motion for summary judgment de novo, applying the same standard as the district court.  <u>Sports Unlimited, Inc. v. Lankford</u>

5

Enters., Inc., 275 F.3d 996, 999 (10th Cir. 2002).  Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if sufficient evidence exists on each side "so that a rational trier of fact could resolve the issue either way" and "[a]n issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim."  Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citations omitted).

**Reverse Discrimination**

Title VII declares that it is an unlawful employment practice for an employer[1] to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Angove contends he was terminated because of his gender. Accordingly, we must analyze his claim under our reverse discrimination framework to determine whether the district court correctly concluded he failed to produce evidence that he was terminated based upon his gender.

---

[1] Title VII imposes liability only upon an "employer," not upon individual supervisors.  See Haynes v. Williams, 88 F.3d 898, 899 (10th Cir. 1996) (concluding a supervisor may not be held personally liable under Title VII).  Accordingly, WSI is the only proper Title VII defendant.

To ultimately prevail on any Title VII claim, a plaintiff must prove termination was based upon intentional discrimination. See EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1191 (10th Cir. 2000). At the summary judgment stage, however, a plaintiff may rely upon either direct or circumstantial evidence of discriminatory intent. See id. Where there is no direct evidence of discrimination, we apply the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Amro v. Boeing Co., 232 F.3d 790, 796 (10th Cir. 2000). Under McDonnell Douglas, a plaintiff must establish a prima facie case of unlawful discrimination. See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1226 (10th Cir. 2000). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. See id. If the employer produces such a reason, the burden returns to the plaintiff, who can avoid summary judgment only if he or she shows that the employer's proffered reason was merely a pretext for unlawful discrimination. See id.

Ordinarily, a plaintiff who has been terminated can prove a prima facie case of employment discrimination by producing evidence that (1) he or she belongs to a protected class, (2) he or she was qualified for the job, (3) despite these qualifications, he or she was terminated, and (4) the job was not eliminated after his or her discharge. See, e.g., Perry v. Woodward, 199 F.3d 1126, 1135 (10th Cir. 1999). Establishing a prima facie case gives rise to the rebuttable presumption that the employer unlawfully discriminated against the employee. See id. A prima facie case is made in a reverse

7

discrimination case where the plaintiff "establish[es] background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." See Notari, 971 F.2d at 589.

We agree with the district court that Angove failed to produce evidence to meet the Notari standard. The court noted that Angove submitted evidence supporting his perception that he was treated unfairly, but that none of the evidence indicated he was treated any differently than female employees. Moreover, the court noted that even assuming WSI's employment manual was not "followed to the 'T,' Angove cannot claim that he was not aware of the criticisms that were previously made of his performance." Aplt. App. I at 18. Finally, the court concluded Boynton's offer to interview the male assistant manager, Tod Neumann, as his replacement "discredited" Angove's assertion that Boynton was interested only in replacing him with a female. Id. at 19.

On appeal, Angove suggests the district court erred by ignoring the fact that he had made a prima facie case of a violation of the EPA since "'[i]n this circuit, Equal Pay Act liability automatically establishes liability under Title VII.'" Aplt. Br. at 47 (quotation omitted). Angove's statement is factually and legally flawed. The factual premise is inaccurate because the district court merely "assume[d] for the purposes of [defendants' summary judgment] motion," that Angove had shown a prima facie case of unequal pay between Angove and MacKenna. Aplt. App. I at 20. Even if the district court had *held* that Angove had set forth a prima facie case of unequal pay, its subsequent recognition

8

that the differential pay between Angove and MacKenna was based on a factor other than gender undercuts his argument that this is a sufficient "background circumstance" demonstrating discriminatory intent. His legal assertion fares no better. As noted, an EPA violation does not establish Title VII liability as Title VII still requires evidence of *intentional discrimination*. See Tidwell v. Fort Howard Corp., 989 F.2d 406, 410 (10th Cir. 1993) (concluding a jury's verdict in favor of plaintiff on the EPA claim did not require judgment in plaintiff's favor on a Title VII unequal pay claim because there was no evidence of intentional discrimination).

Angove complains that Boynton (1) spent an "excessive" amount of time talking on the telephone with other WSI store managers while visiting the Tulsa store, (2) failed to provide the Tulsa store with needed merchandise, and (3) did not return his telephone calls. We have noted that common work-day tribulations are not actionable, as Title VII is not a "civility code." See Gunnell v. Utah Valley State College, 152 F.3d 1253, 1265 (10th Cir. 1998). Even assuming such trivial events were relevant to a Title VII inquiry, Angove's evidence does not remotely suggest that these perceived slights were "because of" his gender. See Amro, 232 F.3d at 798 n.6 (quoting EEOC v. Flasher Co. Inc., 986 F.2d 1312, 1319 (10th Cir.1992) ('Title VII does not make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal. It prohibits only intentional discrimination based upon an employee's protected class characteristics.")). As the district court noted, Boynton often spoke to other store

managers during in-store visits, she had no control over a company-wide inventory problem, and unreturned phone calls were apparently the exception, not the rule.

Angove's reliance upon McDonald v. Corrections Corporation of America, 181 F. Supp. 2d 1274 (D. N.M. 2002) is misplaced. In McDonald, the court found that plaintiff failed to allege any background circumstances indicating that defendant was the type of employer who racially discriminated and, consequently, failed to state a prima facie case of reverse race discrimination. Angove concludes the district court's recognition of plaintiff's lack of evidence essentially canonized the elements necessary to show "background circumstances." Aplt. Br. at 55. Angove claims he presented evidence that he was terminated based upon a decision by a panel of women and a woman was hired to replace him. However, it is perhaps more indicative of a lack of discrimination against male employees that both male and female store managers in the Dallas District were earning more than Angove and three female store managers earned less than Angove.

Reading Angove's appellate brief liberally, he also appears to argue that, even if he failed to satisfy the "background circumstances," he has satisfied the alternative formulation established in Notari. In Notari, we held that "a plaintiff who presents direct evidence of discrimination, or indirect evidence sufficient to support a reasonable probability, that but for the plaintiff's status the challenged employment decision would have favored the plaintiff states a prima facie case of intentional discrimination under title VII." Notari, 971 F.2d at 590. We further stated that "it is not enough, under this

10

alternative formulation, for a plaintiff merely to allege that he was qualified and that someone with different characteristics was the beneficiary of the challenged employment decision." Id. The uncontroverted evidence here not only fails to support such an inference, but supports the opposite inference. As the district court found, WSI's pay policy took into account, among other things, prior salary, retail experience, connections to the community, and other market and geographic conditions.

## Pay Discrimination

Angove also alleges WSI's pay scale violates the Equal Pay Act. Pursuant to the EPA,

> [n]o employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1). At the summary judgment stage, a plaintiff need only produce evidence that an employer paid unequal wages for jobs performed under similar working conditions that required essentially equal skills, effort, and responsibility. See Sinclair v. Automobile Club of Okla. Inc., 733 F.2d 726, 728 (10th Cir. 1984). Unlike in the Title

11

VII context, the burden of persuasion then shifts entirely to the defendant, requiring that the employer prove one of the four specific exceptions justifies the wage disparity. See Tidwell v. Fort Howard Corp., 989 F.2d 406, 409 (10th Cir. 1993).

The district court assumed Angove had carried his initial burden and considered only whether WSI had proved that Angove's wage resulted from a differential "based on any other factor other than sex." 29 U.S.C. § 206(d)(1). The court found "MacKenna had drastically more experience than Angove and was hired at the same salary she had been making at her previous employer." Aplt. App. I at 20. In addition, the district court recognized that some managers, both male and female, made more money than Angove and some, again both male and female, made less. Accordingly, the court determined no reasonable juror could conclude the difference between Angove's and MacKenna's salary had anything to do with gender.

Angove argues the district court "erred in finding that as a matter of law WSI was justified in paying MacKenna a salary at least $12,000 more than Angove based upon her former salary." Aplt. Br. at 43. He primarily contends the court relied on a "market factor" theory to justify MacKenna's salary. In addition, Angove contends the district court either overlooked or failed to appropriately consider various factual allegations.

Although he fails to explain his "market factor" theory, it appears his position refers to employers' attempts to justify their wage disparity upon the "going market rate" for employees of a certain gender. See, e.g., Mulhall v. Advance Sec., Inc., 19 F.3d 586,

12

596 n.22 (11th Cir. 1994). In <u>Corning Glass Works v. Brennan</u>, 417 U.S. 188 (1974), the Court rejected an argument that an employer's higher wage rate for men on the night shift was permissible. The Court explained:

> As its history revealed, the higher night rate was in large part the product of the generally higher wage level of male workers and the need to compensate them for performing what were regarded as demeaning tasks. The differential in base wages originated at a time when no other night employees received higher pay than corresponding day workers, and it was maintained long after the company instituted a separate plant-wide shift differential which was thought to compensate adequately for the additional burdens of night work. The differential arose simply because men would not work at the low rates paid women inspectors, and it reflected a job market in which Corning could pay women less than men for the same work. That the company took advantage of such a situation may be understandable as a matter of economics, but its differential nevertheless became illegal once Congress enacted into law the principle of equal pay for equal work.

<u>Id.</u>

Contrary to Angove's suggestion, the market factor theory has no relevance to his claim. The market factor theory arises where an employer purports to rely upon the "going rate" for an employee of a certain gender. Had WSI set either Angove's or MacKenna's wage based upon what the market would pay *male* or *female* retail store managers, such a practice would clearly violate the EPA. There is no evidence, however, to suggest that WSI attempted to base Angove's or MacKenna's salary upon the "market rate" for a *male* or *female* retail store manager. <u>See</u> Aplt. App. I at 13 ("Other than sales volume, Angove is unaware of the criteria used by WSI to establish store manager

13

salaries.").

> The uncontroverted evidence establishes that WSI's salary range is

> > categorized by the dollar sales volume of the particular manager's
> > store. Managers of stores which generate larger dollar sales are paid
> > at a higher range in recognition of the responsibility involved in
> > producing greater sales volume. These salary ranges are designed to
> > permit flexibility in establishing a particular store manager's base
> > salary based on other factors including job-related experience, skills,
> > qualifications, prior salary history, annual performance appraisals, as
> > well as market and geographic conditions.

Id. at 13. Angove focuses upon WSI's decision to "match" MacKenna's previous salary and suggests this impermissibly relied upon what the market would bear.

Consideration of a new employee's prior salary is not forbidden under section 206(d)(iv). The EPA only precludes an employer from relying *solely* upon a prior salary to justify pay disparity. See, e.g., Irby v. Bittick, 44 F.3d 949, 955 (10th Cir. 1995). However, where an employer sets a new employee's salary based upon that employee's previous salary and the qualifications and experience the new employee brings, the defendant has successfully invoked the Act's affirmative defense. See id. at 955.

As applied to MacKenna, WSI has produced uncontroverted evidence that its decision to match MacKenna's prior salary was for reasons other than gender. WSI relied upon MacKenna's prior retail experience. Under the EPA, "[e]xperience is an acceptable factor other than sex if not used as a pretext for differentiation because of gender." Irby, 44 F.3d at 956. WSI also placed significant importance upon MacKenna's substantial connection to the community, the respect she commanded within the Tulsa shopping

14

center, and the recommendation of the owner of the shopping center.

## Defamation

Angove also alleged that "Boynton knowingly, willfully, or recklessly made a false and unprivileged publication which tends to directly injure Angove in respect to his profession by imputing to him either general disqualification for his position or by imputing to him a mental deficiency that Boynton knows to be false." Aplt. App. V at 1514. Angove alleged that Boynton "spread false and malicious rumors to the effect that Angove had suffered mental impairment and had 'emotional problems' and that was why he 'left,' thereby slandering his professional reputation." Id. at 1512. The district court concluded that Boynton's statement did not constitute a "publication" under Oklahoma law. The court relied upon a well-established rule in Oklahoma defamation law that recognizes conversations between agents of a corporation cannot constitute a publication because "the corporation is, in essence, communicating with itself, and, therefore, there is no publication to a third party." Aplt. App. I at 21 (citing Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1552-53 (10th Cir. 1995), for its reliance upon the rule established in Magnolia Petroleum Co. v. Davidson, 148 P.2d 468 (Okla. 1944)). Angove contends this conclusion was in error and argues (1) the Boynton conversation with Carrie Miller was relayed to Cole, who was at that time not an employee of WSI; and (2) the Magnolia Petroleum rule only applies when the recipient had some purpose for receipt of the information rather than just gossip.

15

Based upon a review of pertinent authorities applying Oklahoma law, we accept the district court's conclusions. Before addressing Angove's specific arguments, it is important to understand the breadth of the Magnolia Petroleum rule. "Communication inside a corporation, between its officers, employees, and agents is never a publication for the purposes of actions for defamation." Thornton v. Holdenville Gen. Hosp., 36 P.3d 456, 460 & n.3 (Okla. Ct. App. 2001). Consistent with this conclusion, we rejected a proposed "gloss" on the Magnolia Petroleum rule that would have narrowed "its holding to insulate from liability only intracompany communications made on a 'need to know' basis for legitimate business reasons." Starr, 54 F.3d 1553 (concluding that liability "cannot turn on the content of, or intent behind, the intracorporate communication"). Moreover, the Magnolia Petroleum rule only requires the speaker and the listener to be employees of WSI at the time the conversation occurred. See Starr, 54 F.3d at 1553 (applying the rule even though the listener was terminated less than twenty-four hours after the conversation). The only publication, if any, occurred when the statement was purportedly relayed by Miller to Cole, who, at that time, was not a WSI employee. Angove, however, has failed to name Miller as a defendant or allege she defamed him.

## Interference With Business Relationship

Angove also alleged Boynton tortiously interfered with his employment relationship. The district court noted that "in order for Angove to proceed on this claim, he must show that Boynton acted in bad faith and was not acting to further the interest of

16

WSI," and concluded that Angove "offered no evidence to convince the Court that Boynton was acting in bad faith and contrary to the interests of her employer." Aplt. App. I at 22. On appeal, Angove contends he submitted sufficient information detailing Boynton's repeated false statements to him and concludes these false statements are sufficient to establish "bad faith." See Aplt. Br. at 62-63.

The Oklahoma Court of Appeals recently stated that in seeking to recover "in an action for malicious interference with contract or business relations a plaintiff must show: (1) That he or she had a business or contractual right that was interfered with; (2) that the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable; and, (3) that damage was proximately sustained as a result of the interference." Brown v. State Farm Fire & Cas. Co., 58 P.3d 217, 223 (Okla. Ct. App. 2002). Nonetheless, a third party (Boynton) who acts on behalf of one of the parties in the business relationship (WSI) ordinarily cannot be liable for such tortious interference unless there is evidence the "employee acts in bad faith and contrary to the interests of the employer in tampering with a third party's contract with the employer." Martin v. Johnson, 975 P.2d 889, 896-97 (Okla. 1998). In support of his contention that Boynton acted in bad faith, Angove claims he submitted evidence that Boynton (1) lied to Angove when he asked for an opportunity to respond to Helmerich's accusations, (2) lied to him by stating that Angove's salary was at the "highest he could be paid and that she would make his salary concerns known," and (3) failed to treat Angove with the respect a store

17

manager deserved, opting instead to "ensure her own survival." Aplt. Br. at 62-63.

We agree with the district court and conclude these allegations are insufficient to withstand a motion for summary judgment. The uncontroverted evidence establishes that Herald made the decision to terminate Angove. Boynton's only connection to the termination decision is related to her investigation of the various claims against Angove. These facts, as a matter of Oklahoma law, do not give rise to liability for interference with Angove's relationship with WSI. See Brown, 58 P.3d at 223 (concluding an insurance agent could not be liable for tortious interference of a policyholder's contract with the insurance company where the agent's sole activity related to investigation of an insurance claim because there was no evidence the agent acted outside the scope of his agency/employment relationship); see also Martin, 975 P.2d at 897 ("The interference with contract tort is not designed to protect against an employee acting in good faith but using poor business judgment. Acting in good faith and using poor business judgment are not mutually exclusive.").

AFFIRMED. We note appellees' objection to appellant's letters of supplemental authority.

Entered for the Court

Mary Beck Briscoe
Circuit Judge