Jan I. **BRICKEY**, Plaintiff,

v.

**EMPLOYERS REASSURANCE CORPORATION d/b/a Employers Reinsurance Corporation, Defendant.**

**No. CIV.A. 02–2557–GTV.**

United States District Court, D. Kansas.

Nov. 24, 2003.

Robert J. Bjerg, Seigfreid, Bingham, Levy, Selzer & Gee, Kansas City, MO, for Plaintiff.

Michael L. Blumenthal, Nancy M. Leonard, Constangy, Brooks & Smith, L.L.C.–Kansas City, Kansas City, MO, for Defendant.

## MEMORANDUM AND ORDER

VanBEBBER, Senior District Judge.

Plaintiff Jan Brickey filed this action against her former employer, Defendant Employers Reassurance Corporation d/b/a Employers Reinsurance Corporation ("ERC"), alleging a claim under the Equal Pay Act ("EPA"), 29 U.S.C. § 206 *et seq.* Brickey was employed by ERC as a municipal bond portfolio manager. Brickey claims that although she performed work that was substantially equal to the work performed by a male portfolio manager, ERC paid her much less. This action is before the court on ERC's motion for sum-

mary judgment (Doc. 38). For the reasons stated below, ERC's motion is denied.

## I. FACTUAL BACKGROUND

The court has reviewed the parties' briefs and the affidavits, depositions and other documents presented to support the parties' positions. For purposes of this order only, the court will provide a brief overview of the facts in a light most favorable to Brickey.

ERC sells policies of reinsurance to insurance companies and invests the premiums paid to it. The money made from investment of the premiums is the principal source from which ERC derives its investment income and gains. ERC employed Jan Brickey from December 2, 1985 through August 26, 2002 at its Overland Park, Kansas location. Brickey began managing municipal bonds in ERC's investment department in 1995, and in 1996 she officially received the title of municipal bond portfolio manager. Brickey's position was eliminated on August 26, 2002 when ERC's investment department was consolidated into GE Asset Management in Stanford, Connecticut.

Only Brickey's work at ERC from 1999 through 2002 is germane to this lawsuit. During this period, Brickey's federal tax withholding statements ("W–2's") indicate ERC paid her the following compensation: $74,010.58 in 1999; $85,637.65 in 2000; $91,149.26 in 2001; and $108,113.19 in 2002. In this action, Brickey claims that she performed substantially equal work, but was paid less than another municipal bond portfolio manager at ERC, Brad Postema. Brad Postema's W–2's for 1999 through 2002 indicate ERC paid him the following compensation: $112,078.25 in 1999; $184,199.56 in 2000; $199,183.68 in 2001; and $254,033.55 in 2002.

On July 12, 1999, ERC hired Brad Postema as a municipal bond portfolio manager in the investment department.

Before working at ERC, Postema worked at Key Asset Management as a senior portfolio manager. At the time of Postema's hiring, ERC paid him $140,000 in base salary plus an additional $70,000 in bonuses. ERC maintains that it needed to pay Postema this amount to attract him away from Key Asset Management, to relocate him from Cleveland, Ohio, to Kansas City, Kansas, and to compensate him as a future leader of ERC's municipal bond group. After working six months in the investment department, ERC states that Postema became the manager of the municipal bond portfolio group and took on responsibilities that were in addition to his portfolio management duties. Although Postema originally applied for a municipal bond portfolio manager position at ERC, ERC alleges that a verbal understanding existed between ERC and Postema to make Postema the leader of the municipal bond portfolio group. As manager of the group, ERC asserts that Postema had a supervisory role over Brickey and two other employees, that Postema attended investment strategy meetings with senior management, and that Postema retained managerial responsibilities within the municipal bond portfolio group that Brickey did not possess.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Lack of a genuine issue of material fact means that the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. "[A] party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* The court must consider the record in the light most favorable to the nonmoving party. *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984).

## III. DISCUSSION

### A. Brickey's Prima Facie Case Under the EPA

In *Sprague v. Thorn Americas, Inc.,* the Tenth Circuit outlined the elements required to prove a prima facie case under the Equal Pay Act:

"[a plaintiff] has the burden of proving that (1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; [and] (3) the male employees were paid more under such circumstances."

129 F.3d 1355, 1364 (10th Cir.1997) (quoting *Tidwell v. Fort Howard Corp.,* 989 F.2d 406, 409 (10th Cir.1993)).

■ ERC's summary judgment brief "does not dispute that it paid Brickey less than it paid Postema, nor that they worked under basically the same working conditions." ERC, however, maintains that Brickey cannot establish that she performed work substantially equal to Brad Postema. After reviewing the record, the court concludes that genuine issues of material fact remain as to whether Brickey performed work substantially equal to Postema.

■ "The issue whether two or more jobs require equal work in EPA terms is decided on a case-by-case basis." *Thomas v. Bd. of Educ., Unified Sch. Dist. No. 501, Topeka, Kansas,* No. 95–4218–SAC, 1997 WL 723437, at *8 (D.Kan. Oct.31, 1997) (citing *Brobst v. Columbus Servs. Intern.,* 761 F.2d 148, 156 (3rd Cir.1985)). "The relevant comparison is between the jobs and not the people holding them." *Id.* (citing *Mulhall v. Advance Sec., Inc.,* 19 F.3d 586, 592 (11th Cir.1994)). Courts "do not construe the 'equal work' requirement of the EPA broadly...." *Sprague,* 129 F.3d at 1364. "[F]ailure to furnish equal pay for 'comparable work' or 'like jobs' is not actionable." *Id.* But employers may not avoid liability under the EPA "by drawing overly fine distinctions in the tasks at issue." *Brennan v. S. Davis Comty. Hosp.,* 538 F.2d 859, 861 (10th Cir.1976).

■ "Substantial equality is to be evaluated in terms of skill, effort and responsibility...." *EEOC v. Cent. Kan. Med. Ctr.,* 705 F.2d 1270, 1272 (10th Cir.1983). This requires the court to make

"... a practical judgment on the basis of all the facts and circumstances of a particular case. Skill includes such considerations as experience, training, education, and ability. Effort refers to the physical or mental exertion necessary to the performance of a job. Responsibility concerns the degree of accountability required in performing the job. Application of the Equal Pay Act depends not on job titles or classifications but on the actual requirements and performance of the job. ..."

*Id.* (citing *EEOC v. Universal Underwriters Ins. Co.*, 653 F.2d 1243, 1245 (8th Cir.1981)); *see also* 29 C.F.R. §§ 1620.13–.17 (2003). This inquiry is a factual determination. *Thomas,* 1997 WL 723437, at *9 (citing *Fallon,* 882 F.2d at 1208). " 'Given the fact intensive nature of the inquiry, summary judgment will often be inappropriate.' " *Id.* (quoting *Brobst,* 761 F.2d at 156). In support of its contention that Brickey did not perform work substantially equal to Postema, ERC argues that Postema's job responsibilities differed from Brickey's job responsibilities in two areas: (1) Postema retained managerial and supervisory responsibilities that Brickey did not; and (2) Postema managed larger municipal bond portfolio assets and generated greater revenues than Brickey.

ERC first argues that Postema's supervisory and managerial responsibilities preclude Brickey's claim that she performed work substantially equal to Postema. ERC maintains that beginning in February 2000, Postema became the manager of the municipal bond portfolio group. ERC claims Postema was accountable for all of the municipal bond portfolios managed by the municipal bond group and that this responsibility included the supervision of three employees, including Brickey. Specifically, ERC claims that Postema supervised Brickey's day-to-day performance, prepared her performance reviews, and provided input on the salary increases

Brickey received. ERC also claims that as manager of the municipal bond portfolio group, Postema participated in investment strategy meetings with other managers of the investment department and participated in presentations to senior leadership regarding the status of the portfolios managed by the municipal portfolio group. Finally, ERC asserts that Postema led the municipal bond group in "Project BP." This project focused on the consolidation efforts of ERC's investment functions to GE Asset Management in Connecticut. ERC claims Project BP required Postema to form working groups, attend meetings in Connecticut, and to conduct analysis necessary to complete the project.

The court determines that Brickey has provided sufficient evidence to dispute the substantiality of Postema's supervisory and managerial duties, and that genuine issues remain for the trier of fact. First, Brickey acknowledges that Postema completed a mid-year and annual performance review for Brickey in 2001. The evidence presented, however, shows that Postema did not complete performance reviews for Brickey in 1999, 2000 or 2002, and that it took Postema no more than a day to finish the review process. Brickey also provided evidence disputing ERC's claim that Postema performed any day-to-day supervision over Brickey's management of her portfolios. Second, Brickey presented evidence to show that in the past she participated in all of the investment strategy meetings, but that once ERC promoted Tom Powers as the new Chief Investment Officer of ERC, Brickey was excluded from those meetings. Finally, Brickey presented evidence that Project BP was a team effort and that she participated substantially in the consolidation effort of ERC's investment group to GE Asset Management.

The court concludes that genuine issues remain as to whether the additional duties ERC alleges Postema possessed are merely peripheral to Postema's portfolio management functions or whether Postema's additional duties are materially different tasks that preclude a finding that Brickey performed substantially equal work to Postema.

■ ERC next claims that Brickey did not perform substantially equal work to Postema because Postema managed significantly larger portfolios that generated significantly larger revenues than Brickey.[1] The consequences of mismanaging larger portfolios, ERC asserts, are proportionate to the size of an employee's respective portfolios. Thus, ERC contends Postema's management of larger portfolios involved a greater degree of responsibility than Brickey's management of smaller portfolios. In support of its argument, ERC cites several cases for the proposition that "employees responsible for managing aspects of a business that generate vastly different sums of money are not performing work that is substantially equal, even where the skill and experience to perform those jobs are comparable." *See Angove v. Williams–Sonoma, Inc.,* 70 Fed. Appx. 500 (10th Cir.2003); *Sprague,* 129 F.3d 1355; *Sobol v. Kidder, Peabody & Co.,* 49 F.Supp.2d 208 (S.D.N.Y.1999).

After considering ERC's arguments, the court concludes Brickey has produced sufficient evidence to create a genuine issue for the trier of fact as to whether a significant difference in responsibility existed between Bricky and Postema's work as a result of the larger portfolios Postema managed. First, Brickey provided evidence that the greater revenues Postema generated from his larger portfolios were not the result of any increased work or effort by Postema, but were merely a function of the size of his larger portfolio. Brickey presented testimony from Kathleen King, a former portfolio manager at ERC, who testified that a larger portfolio did not require additional skills or duties and that it was actually easier to trade in larger blocks of bonds because it is easier to find a broker. Second, the court notes that the evidence is conflicting as to the consequences of mismanaging a larger portfolio versus mismanaging a smaller portfolio. Tom Powers, Chief Investment Officer at ERC, testified that he was not aware of any defaults within the portfolios that ERC managed. Brad Smith, a former portfolio manager at ERC, also testified in his deposition regarding the responsibility and the consequences of managing a larger versus a smaller portfolio:

> Smith: ... The responsibility of blowing up the four-billion-dollar portfolio as opposed to blowing up a two-million dollar portfolio had larger ramifications on Employers Reinsurance, there's no question.... But we'll go back into the context of what we were looking at, we weren't going to blow the portfolios up anyway, so I mean, you can't-you can ask the question both ways, and that's-that's debatable.
>
> Mr. Berg: Okay. The-the consequences of making a poor strategy decision,

---

1. It is undisputed that in July of 1999, Postema managed the following portfolios: GE Re, Medical Protective and Core. Sometime in the last quarter of 1999, ERC assigned Postema the responsibility of managing the ERC fixed income fund. The total amount of assets Postema managed from 1999 to 2002 are as follows: 3.846 billion in December 1999; 3.782 billion in December 2000; 4.841 billion in December 2001; and 5.729 billion in December 2002. From 1999 to 2002, Brickey managed the following portfolios: ERC Total Return; Westport Re; and First Specialty. The total amount of assets Brickey managed from 1999 through 2002 are as follows: 741 million in December 1999; 769 million in December 2000; 1.967 billion in December 2001; and 2.641 billion in 2002.

would that be greater with a smaller portfolio or a larger portfolio?

Smith: In the context of me making a bad decision for Employers Re and Jan making a bad decision for Westport, they're the same. Her impact to Westport is the same as mine is to ERC. Now, the impact to the holding company or the entire organization obviously, bigger with the-actually, the more assets, the more losses. But let's talk about it in the context of where I'm at right now. And if I look at our four clients, I make a mistake for the big one, I make a mistake for the small one, they're equal, because they are four independent organizations in the context of ERC....

The court determines that the testimony provided by Powers and Smith create a genuine issue as to whether the consequences of mismanaging a larger portfolio versus a smaller portfolio are substantially different. Finally, Brickey provided evidence that she frequently traded in Postema's portfolios. The court concludes this evidence also creates issues of fact as to whether a difference in responsibility existed between Brickey and Postema based on the size of the portfolios they each managed. If Brickey traded in Postema's portfolios, this provides evidence that her job responsibilities also involved trading in large portfolios.

The court concludes that Brickey has provided sufficient evidence to create genuine issues as to her prima facie case under the EPA. Accordingly, the court denies ERC's summary judgment motion on this basis.

### B.  Defendant's Affirmative Defense

■ "[O]nce an EPA plaintiff has established a prima facie case, the burden of persuasion shifts to the defendant to prove an affirmative defense-that the pay differential was 'premised on a factor other than sex.'"  *Meek v. Swift Transp. Co., Inc.,*

No-99–2233–JWL, 2000 WL 382039, at *5 (D.Kan. April 11, 2000). An employer's burden is a heavy one. The employer "must produce sufficient evidence such that no rational jury could conclude but that the proffered reasons actually motivated the wage disparity of which the plaintiff complains."  *Id.* (citing *Stanziale v. Jargowsky,* 200 F.3d 101, 108 (3rd Cir. 2000)).

■ ERC maintains that the difference between the total compensation of Brad Postema and Jan Brickey is based on: (1) Postema's prior salary at Key Asset Management; (2) the need to recruit Postema away from Key Asset Management; (3) Postema's Wall Street reputation; and (4) the additional responsibilities Postema accepted as manager of ERC's municipal bond group, including the responsibilities of managing portfolios worth more than Brickey's portfolios.

"Courts have determined that an individual's experience, market value, management potential and former salary are 'factors other than sex' as defined under 29 U.S.C. § 206(d)(1)(iv), and thus permit an employer to pay higher salaries based on these factors."  *Varley v. Superior Chevrolet Auto. Co.,* No. 96–2119–EEO, 1997 WL 161942, at *11 (D.Kan. Mar.21,1997) (citing *EEOC v. Aetna Ins. Co.,* 616 F.2d 719, 726 (4th Cir.1980); *Horner v. Mary Inst.,* 613 F.2d 706, 714 (8th Cir.1980)); *see also Angove v. Williams–Sonoma, Inc.,* 70 Fed. Appx. 500, 508 (10th Cir.2003) ("The EPA only precludes an employer from relying solely upon a prior salary to justify pay disparity.").

The court concludes that ERC has not provided sufficient evidence to show that ERC's "proffered reasons *do in fact* explain the wage disparity" between Brickey and Postema.  *See Meek,* 2000 WL 382039, at *5 (citation omitted). The court notes that ERC provided testimony by Tom

Powers, Chief Investment Officer at ERC, discussing the above mentioned factors that allegedly contributed to Postema's total compensation. Brickey, however, points out that Postema's job application and cover letter to ERC reveal that Postema was making $97,000 as his end salary at Key Asset Management and that Postema desired to make in "excess of 100K" at ERC. Upon hiring Postema, ERC paid him $140,000 in base salary, a $30,000 signing bonus, a $30,000 bonus in the first quarter of 2000 and an additional $20,000 performance bonus in the first quarter of 2000. In sum, ERC paid Postema $210,000 during his first year of work, a figure well over the amount Postema requested in his cover letter. Second, ERC's 1999 organizational chart indicates Brickey and Postema were both peers in ERC's municipal bond portfolio group; Postema did not take on any of the alleged managerial responsibilities at ERC until February 2000. ERC, however, paid Postema a much higher salary than Brickey despite the fact that he did not have any additional supervisory roles during this period. Third, Postema managed a larger amount of assets compared to Brickey, but Tom Powers declined to state that a direct relationship existed at ERC between an employee's salary and the value of an employee's portfolios. Mr. Powers testified only that the value of the portfolios was "an input into the amount of money that was offered" to Postema. ERC's argument that Postema's responsibility for managing larger assets is a factor that contributed to his higher salary is also questionable considering that in 2002 Brickey was responsible for managing $2.641 billion in assets. Brickey's total compensation in 2002, however, was not even close to Postema's starting salary in 1999, when Postema managed $1.65 billion in assets. Finally, the court concludes that the different percentages used in ERC's retention bonus agreements create an issue for the trier of fact as to the pay disparity. In 2002, ERC paid bonuses to its investment department employees so that they would stay with the company until the department's transfer to GE Asset Management in Connecticut was complete. ERC paid four women, including Brickey, bonuses at a rate of fifteen percent of their base salary. At the same time, ERC paid three men, including Postema, bonuses at fifty percent of their base salary plus an additional cash variable incentive bonus.

The court concludes genuine issues remain for the trier of fact regarding the proffered reasons for the disparity in pay between Brickey and Postema. Accordingly, ERC's motion is denied on this basis.

IT IS, THEREFORE, BY THE COURT ORDERED that ERC's motion for summary judgment (Doc. 38) is denied.

Copies of this order shall be transmitted to counsel of record.

**IT IS SO ORDERED.**