| **Manta v Hofstra Univ.** |
|:---:|
| 2024 NY Slip Op 33915(U) |
| November 1, 2024 |
| Supreme Court, New York County |
| Docket Number: Index No. 157061/2021 |
| Judge: Shlomo S. Hagler |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:  **HON. SHLOMO S. HAGLER**                    PART                    17
                                                        *Justice*

-----------------------------------------------------------------X

IRINA MANTA

                                                        INDEX NO.              157061/2021

                        Plaintiff,                      MOTION DATE            11/13/2023

                - v -                                   MOTION SEQ. NO.        003

HOFSTRA UNIVERSITY,                                     **DECISION + ORDER ON
                                                         MOTION**

                        Defendant.

-----------------------------------------------------------------X

The following e-filed documents, listed by NYSCEF document number (Motion 003) 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 119, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 199, 200, 201, 202, 203, 204, 205, 206, 207, 220, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 238, 239, 240, 241

were read on this motion to/for                       JUDGMENT - SUMMARY                    .

Under motion sequence number 003, defendant Hofstra University moves pursuant to

CPLR 3212 for an Order granting defendant summary judgment dismissing plaintiff's complaint

in its entirety. Plaintiff Irina Manta opposes this motion.

## FACTS

**Deposition of Plaintiff**

*Background and original teaching offer at Hofstra*

Plaintiff attended Yale Law School and graduated in 2006 (Plaintiff Dep. [NYSCEF Doc.

No. 64] at 16). Following law school, plaintiff clerked for a judge on the United States Court of

Appeals for the Eighth Circuit (*id.* at 20). Simultaneously, she worked as an adjunct professor at

the University of Arkansas School of Law (*id.* at 20, 23). For the next two years, plaintiff was a

Bigelow Teaching Fellow at the University of Chicago Law School (*id.* at 26). Plaintiff then

157061/2021  MANTA, IRINA vs. HOFSTRA UNIVERSITY
Motion No.  003

Page 1 of 29

[* 1]

worked as an Assistant Professor at Case Western Reserve University Law School from 2009 to 2012 (*id.* at 37). Plaintiff also served as a visiting associate professor at Brooklyn Law School during the 2011-2012 academic year (*id.* at 48-49, 55).

Plaintiff became interested in a position at Hofstra after she met Lea Shaver (*id.* at 60). Shaver was a professor at the time plaintiff met her but was leaving Hofstra at the end of that academic year (*id.*). Plaintiff testified "I believe [Shaver] was the one who told me that Julian Ku was the hiring chair that year, and I believe I contacted Julian somehow as a result of that, and that's what started the process" of plaintiff's application to Hofstra (*id.*). Plaintiff testified that "[e]ventually, I got an interview, on-campus visits, and then got an offer" (*id.*). On March 14, 2012, plaintiff received an offer for a tenure-track faculty member position from Nora Demleitner, who was the dean at Hofstra Law School at the time (*id.* at 79). Plaintiff testified that she had two conversations with Demleitner about her offer. In the first conversation, Demleitner offered plaintiff a salary of $124,000 (*id.* at 83). In one of the conversations, Demleitner also offered plaintiff a "summer stipend of around $20,000" (*id.*). Plaintiff did not remember Demleitner ever mentioning law school graduation year as being a factor in determining plaintiff's salary (*id.* at 86). Plaintiff did not accept the salary offer of $124,000 in the original phone call (*id.* at 86-87).

Plaintiff testified that she spoke to Julian Ku via email regarding the first offer (*id.* at 87). Plaintiff testified, "I believe we spoke about what I consider to be the low compensation that I was being offered at Hofstra" (*id.* at 90). Plaintiff recalls asking Ku "about negotiating for a better salary, and he . . . said that []he had had conversations and was told that the way the system works, that would preclude room for negotiation" (*id.* at 91).

On March 19, 2012, plaintiff received an email from Ku that stated, "I have checked with a couple of folks, and they have confirmed that the year of law school graduation thing is a bit rigid and not something that is easily departed from" (*id.* at 92). Plaintiff testified that this email followed a conversation where Ku had explained that the year of law school graduation played a role in determining a starting salary (*id.* at 93).

On March 20, 2012, plaintiff spoke again with Demleitner about the offer (*id.* at 98). Plaintiff and Demleitner confirmed that plaintiff would be receiving a three-year appointment, and that plaintiff would be up for consideration for tenure in the third year (*id.* at 99). Plaintiff recalls asking for a base salary of $150,000 (*id.* at 104). Plaintiff testified that Demleitner left her position as dean in the middle of the salary negotiations with plaintiff, so "[t]he process was a bit unusual in the sense that at some point in these conversations [plaintiff] got handed over basically from Dean Demleitner to Eric Lane, who was on his way to becoming the interim dean" (*id.* at 85). Plaintiff's first conversation with Dean Eric Lane was via email on March 22, 2012, where Lane offered to increase plaintiff's base salary from $124,000 to $129,000 (*id.* at 108-109). Plaintiff requested, and Lane confirmed, a start date of July 1st, 2012, two months before the start date offered by Demleitner of September 1st (*id.* at 110-12). Plaintiff received an official offer letter that she signed in June 2012 (*id.* at 124).

*Subject interactions between plaintiff and Dean Eric Lane*

Plaintiff stated that in the initial salary negotiation she had with Lane, he was "quite forceful in what he was saying, but I did not have any other problems with him" and that she did not feel discriminated against because of gender in that initial conversation (*id.* at 137). Plaintiff testified that "[i]n a later conversation down the line after I had already been hired, the comments he made about my hair did appear to be a gendered comment" (*id.*). Plaintiff testified that in a

[* 3]

conversation with Lane about plaintiff's compensation, "he just sort of stopped in the middle of our talking about this and apropos of nothing said, did you do something to your hair? It looks nice" (*id.* at 137-38). Plaintiff also testified:

> Two instances or two things that I remember in particular is that at one point he thought that I was interviewing with other schools and he questioned me about it, and we came to a, I'm going to say, quote/unquote, agreement that I would let him know if I had any—if I do any job talks at another school. And he said I will support you until then, the implication in my mind being that if I—thought that he would take punitive action against things like my travel support, etcetera, if I engaged too intensely in looking for other employment.

*Id.* at 140. Plaintiff testified that the other instance of alleged gender discrimination by Lane occurred when "[h]e shut me down in what I believe was his final faculty meeting as dean and sort of scoffed at me and spoke to me mockingly" (*id.* at 142). In both those instances, Lane "did not specifically reference" plaintiff's gender (*id.*).

In 2014, when plaintiff was a professor, Hofstra Law School created a new center for intellectual property law at plaintiff's suggestion (*id.* at 144). Plaintiff testified that Lane supported both the opening of the intellectual property law center and plaintiff's position as the director of the center (*id.* at 146). Plaintiff also testified that in 2015 when plaintiff applied for tenure, Lane was supportive of her bid for tenure (*id.* at 154-55). Lane recommended her for tenure, stating "The recommendation is based on my own judgment that Professor Manta is a very good teacher, an excellent young scholar, and a strong institutional citizen, particularly through her creation of the intellectual property center" (*id.* at 155). Plaintiff was ultimately granted tenure (*id.* at 160).

*Plaintiff's later salary negotiations*

Plaintiff testified that she had another discussion with Lane about her salary in 2014 (*id.* at 163). Plaintiff testified that she had spoken to several other intellectual property professors in

**157061/2021  MANTA, IRINA vs. HOFSTRA UNIVERSITY**
**Motion No.  003**

**Page 4 of 29**

4 of 29

the New York area and believed she was underpaid compared to them (*id.* at 163). She testified that when she brought this to Lane's attention, he told her that "nobody at the law school could be paid more than the person above them. And so even though he acknowledged my contributions and all the things I was doing, he said that he was unable, as a result of that system that he was describing, to raise my compensation" (*id.* at 164).

Plaintiff also testified as to a conversation in the fall of 2016 between herself and Lane where plaintiff told Lane she felt she was underpaid and Lane told her "basically that he didn't know how much people make or something like that, and then he said that he thinks the base is based on law school graduation year, that he would have to go check" (*id.* at 167). Plaintiff testified that at one point the three lowest-paid members of the faculty at the time, including herself, were given awards of between $20,000 to $20,040, and the rest of the faculty was given a merit award of $12,040 (*id.* at 221).

*Plaintiff's subject interactions with Dean Gail Prudenti*

Gail Prudenti replaced Eric Lane as Dean of the law school. Plaintiff testified that she believed Prudenti had discriminatory animus toward plaintiff because of her gender (*id.* at 223). Plaintiff testified as to a conversation in 2022 where she felt Prudenti displayed discriminatory animus towards her (*id.*). Plaintiff also testified that another time, Prudenti didn't seem interested in an event plaintiff put on (*id.* at 233).

Plaintiff testified that the first time she raised the issue of gender disparity in pay to Prudenti was around 2017 when Prudenti took over the position of interim dean from Lane (*id.* at 235). Plaintiff testified that Prudenti was "inviting" and open to hearing plaintiff's concerns, so plaintiff prepared a memo that highlighted some salary disparities plaintiff perceived (*id.* at 236). Plaintiff in the memo compared her own salary to three other faculty members and complained

**157061/2021  MANTA, IRINA vs. HOFSTRA UNIVERSITY**                    **Page 5 of 29**
**Motion No. 003**

5 of 29

that her salary was low compared to them (*id.* at 240). Plaintiff said in talking with Prudenti after plaintiff wrote the memo, Prudenti "did not admit that there was gender discrimination, although, she did acknowledge my being underpaid" (*id.* at 244-45). Prudenti also "represented that she would be trying again to obtain a higher sum than what [plaintiff] had received to that point" (*id.* at 246). Plaintiff testified that in 2017, she and several other faculty members received a salary increase (*id.*).

*Plaintiff's position as Research Dean*

Plaintiff was appointed to the position of Associate Dean of Research on August 29, 2018 for the upcoming 2018-2019 academic year (*id.* at 314). Plaintiff had raised her concerns of gender discrimination with Prudenti and university counsel prior to August 2018 (*id.* at 314-15). Dean Prudenti appointed her to the position, and plaintiff served as Associate Dean of Research from September 1, 2018 through August 31, 2019 (*id.* at 316).

In December of 2018, plaintiff had her lawyer send Hofstra a letter "alleging discrimination" (*id.* at 314). On March 7, 2019, plaintiff informed Hofstra that she was offered a visiting professor role at St. John's Law School (*id.* at 316). When plaintiff informed Prudenti and Ku that she was offered a visiting professor role at another law school, Ku told her that the position of Associate Dean of Research would be reassigned because Hofstra wanted someone in the role who was not visiting at another institution (*id.* at 317). Plaintiff told Ku and Prudenti that she wanted to stay in the role of research dean while visiting at St. John's but was told that she could not do both simultaneously, and plaintiff was not offered the position again when she returned from her visiting professor position (*id.* at 319). Plaintiff was not aware of anyone at Hofstra that held the research deanship while visiting at another institution (*id.* at 318).

**157061/2021   MANTA, IRINA vs. HOFSTRA UNIVERSITY**
**Motion No. 003**

**Page 6 of 29**

6 of 29

**Deposition of Julian Ku**

Julian Ku began working as a professor at Hofstra University Law School in 2002 (Ku Dep. [NYSCEF Doc. No. 65] at 38). Ku became the Senior Associate Dean for Academic Affairs in September 2017, and Vice Dean of Academic Affairs in 2022 (*id.* at 53, 55). Ku was shown the email exchange between himself and plaintiff about plaintiff's salary where Ku stated that the school's practice of setting starting salaries based on law school graduation date was "a bit rigid and not easily departed from" (*id.* at 195). Ku testified that that language "makes me think that [law school graduation year] is a starting point" for salaries and salary negotiations (*id.* at 198).

Ku testified that when the position of research dean opened up, he suggested Prudenti appoint plaintiff to the position (*id.* at 282). Ku was also involved in the decision to remove plaintiff from that position (*id.*). Ku did not remember exactly why plaintiff was removed from the research dean position but testified that "I think it had a lot to do that she was doing a visit at another law school" (*id.*). Ku testified that the professor holding the research dean position would "have to be" at Hofstra rather than visiting elsewhere (*id.*). Ku stated that it would be difficult for a professor visiting elsewhere "to be focused on advancing the institution in the same way when you're being considered by another school, so it's not so much the geography. It's the fact that it's another institution she might leave for" (*id.* at 285-86).

**Deposition of Eric Lane**

Eric Lane began working as a professor at Hofstra Law School in 1976 (Lane Dep. [NYSCEF Doc. No. 67] at 14). In 2012 Lane became the interim dean when Nora Demleitner left the position (*id.* at 14, 17). Lane served as the dean until early 2017 (*id.* at 20).

**157061/2021   MANTA, IRINA vs. HOFSTRA UNIVERSITY**
Motion No. 003

**Page 7 of 29**

7 of 29

Lane testified that when the law school was looking to hire a new faculty member, there would be a search committee made up of faculty members who "would search and find some candidates who were willing and do some screening" (*id.* at 24). The committee would present their findings to the faculty as a whole and the faculty would vote on "whether or not they . . . wanted this person to be a member of the faculty. And then the faculty's recommendation, affirmative recommendation only, would be sent to the dean" (*id.*). Lane continued that "the dean then makes the final determination. . . I'm not even sure the dean could reject it" (*id.*).

Lane testified as to his familiarity with a memorandum written by Dolores Fredrich, general counsel for Hofstra, detailing how the law school sets salaries. Lane testified, "When I was the dean, salaries were set on the basis of years out with some discretion in the dean regarding . . . other factors that are listed" in the memo (*id.* at 29). Lane testified:

> Q. So while you were dean, is it accurate that that was the primary consideration in setting salaries [was] the number of years after graduation from law school?
> A. That's correct.
> Q. And you said that there was—beyond that there was some discretion to consider other factors?
> A. Yes.
> Q. What were those other factors?
> A. [T]he economic situation of the school, how much we needed the person, what the person could bring to the school, et cetera. That type of thing.
> . . .
> Q. Can you describe that discretion in any more particularity?
> A. Mary [Ruggilo]. . . would give me a rough figure. . . sometimes a range, based on years out and I would think about some of the other factors and make a determination based on that. But there was always budget restraints. So it's not as if I could have said to somebody, oh, you know, I'm going to give you 10, $15,000 more than what Mary recommended. That would have been totally beyond my discretion. And stupid.

*Id.* at 29-31. Lane testified that he normally stayed within the range proposed by Ruggilo,[1] but "one particular time I went above the range, but not much above the range. By not

---

[1] At the time of plaintiff's hire Mary Ruggilo was an Assistant Dean of Finance at Hofstra Law School (Ruggilo Dep. [NYSCEF Doc. No. 71] at 11).

**157061/2021  MANTA, IRINA vs. HOFSTRA UNIVERSITY**
**Motion No. 003**

**Page 8 of 29**

much I mean 5,000 or $4,000" (*id.* at 33). Lane testified that he had spoken to at least three previous deans about the process of setting salaries for new faculty hires (*id.* at 38-39). Lane testified that each of those deans affirmed "the idea . . . that salaries were set based on number of years of experience following the graduation from law school" (*id.* at 39).

Lane remembered plaintiff wanted to negotiate her salary and Lane participated only in the latter half of the salary negotiations (*id.* at 40, 56). Lane testified that plaintiff's prior experience at Case Western "might go into [his] consideration" of whether to "give her some money that's within my discretion. But it wouldn't have gone into my baseline consideration of years out" (*id.* at 69). Lane also testified that Hofstra Law School considered all post-law school experience equally (*id.* at 71).

Lane testified that at some time before plaintiff's employment with Hofstra, Lane met plaintiff for lunch where they discussed her salary and other benefits of the role (*id.* at 76-77). Lane testified that he offered plaintiff a starting salary of $129,000 (*id.* at 77). When asked how he arrived at that number, Lane responded:

> [I]f I recall, at the time we definitely needed an intellectual property person. I was a little bit concerned that she wasn't—I wouldn't be able to get the university to give her the earlier pay starting in July rather than in September, that she would not be covered by insurance. And that, you know, I wanted her to come and—but I also at the same time we were under a desperate economic situation then. . . . So all that context comes together for me to say, I'll give you $5,000 more dollars. That's how I decided. I thought she should get a little bit more because I was worried that I wouldn't succeed in helping her in other ways. So I give her a little more. But that's all I could give her.

*Id.* at 78-79.

**Deposition of Gail Prudenti**

Judge Gail Prudenti became interim dean of Hofstra Law School in January 2017 and was announced as permanent dean in "June or July" of 2017 (Prudenti Dep. [NYSCEF Doc. No.

157061/2021  MANTA, IRINA vs. HOFSTRA UNIVERSITY
Motion No. 003

Page 9 of 29

9 of 29

[* 9]

66] at 25, 26, 31). Prudenti testified that when she was interim dean, "[v]ery simply put, not enough money was coming in [to the Law School] and more money was going out" (*id.* at 36). As Prudenti was transitioning into the role of interim dean she had meetings with Eric Lane (*id.* at 39). Prudenti testified that Lane told her that plaintiff "was an excellent scholar" (*id.* at 40). Prudenti's testimony as to the hiring process at Hofstra Law School was similar to Lane's. Prudenti testified that after the hiring committee made its recommendation to the dean,

> [M]yself as the dean would take a look at the year of graduation and where that person would fall on my list. My next step would be to talk to Mary with regard to what was budgeted for that position. I would review the resume. I would speak to the academic dean and I would have the candidate come in for an interview, if possible, or Zoom or talk to me telephonically, if not possible.

*Id.* at 42-43. Prudenti testified that she would also look at the candidate's resume (*id.* at 45). Prudenti described year of graduation as "purely a starting point. What was their year of graduation . . . what did they do before they got to the law school. And not just teaching, whether they worked in law firms, whether they had any extraordinary experiences. What they would bring to Hofstra Law" (*id.*).

Prudenti testified that a salary offer for an entry level professor could differ significantly from what a lateral candidate with a lot of post-law school experience might be offered (*id.* at 49). Prudenti continued:

> So if you're saying to me, okay, if somebody has 20 years' experience that they're going to get the same at entry level that they would at lateral, I would say to you no, that's not a fair assessment. There are many other factors that are going to come into this. Standing in the legal community, gravitas in different positions. You know, the needs of the law school. The financial condition of the law school. The desire of the faculty to make special efforts to obtain that candidate to come to Hofstra Law. So it's not just one factor. You start with, okay, how many years from graduation. And then you go from there. But that isn't the only determining factor.

**157061/2021  MANTA, IRINA vs. HOFSTRA UNIVERSITY**
Motion No. 003

**Page 10 of 29**

[* 10]

10 of 29

*Id.* at 50-51. Prudenti testified that the salary had to be approved by central administration of the university as well as the president of the university (*id.* at 47).

When plaintiff approached Prudenti with concerns about her salary in comparison with other faculty members, Prudenti testified that she looked at the faculty roster and "I saw in certain instances, females paid more than males. And . . . at other times, males made more than females" (*id.* at 79). Prudenti testified that she "did not see any sort of gender discrimination" (*id.* at 80). Prudenti believed plaintiff "didn't take into account totality of circumstances" and incorrectly believed her tenure "played into how her salary was determined at the time" (*id.* at 81). Prudenti further testified that she told plaintiff that she "would bring her concerns to the president and I would try to get more money. And that's what I did" (*id.*).

When asked if there was a salary scale based on age or year of graduation, Prudenti responded, "No. There is a basic starting point on year of graduation and there is a discussion with regard to the budget and finances of the law school" (*id.* at 138). Prudenti testified:

> [F]rom looking at the salary schedule, it appears clear to me that date of graduation was important . . . Now, that doesn't mean there's not exceptions, like lateral hires or something like that. . . Your secondary point is finances, what's in the budget, what is scheduled to be paid in the budget, is there a range in that budget. And I believe that the dean has some discretion, okay, based on other factors to raise that salary. There's not a lot of discretion because there's not a lot of money that is put into the budget for these positions.
> . . .
> But what I'm saying is there's a myriad of factors, it's not one factor that does into setting salary. In my mind, it's year of graduation, budget to a large extent. And then other factors.

*Id.* at 186-88.

Prudenti agreed that the dean has some discretion in determining starting salary. Prudenti testified that she believed that Lane and Demleitner before her used the same hiring considerations (*id.* at 198). Prudenti testified as to several salary adjustments she made in 2017

**157061/2021   MANTA, IRINA vs. HOFSTRA UNIVERSITY**                          **Page 11 of 29**
**Motion No.  003**

11 of 29

where she increased the salaries of several faculty members (*id.* at 205). Among those professors who received a salary increase was plaintiff, and Prudenti testified that she gave plaintiff a $15,000 salary adjustment on the basis of "incredible scholarship" (*id.* at 208).

Prudenti testified that she and Ku were involved in appointing plaintiff as research dean (*id.* at 255). Prudenti testified that plaintiff did not continue in the role when "she decided to visit out at St. John's University Law School," at which time "another professor was chosen to be research dean" (*id.* at 256-57). Plaintiff offered to continue serving as research dean while she was visiting at St. John's but Prudenti and Ku decided that keeping plaintiff as research dean "would not serve Hofstra Law well" (*id.* at 257). Prudenti explained, "you're working at another law school, a competitor law school, and you're working there full-time. They're paying you and, you know, you're the research dean at Hofstra" (*id.*). Prudenti testified that it was her understanding "that that's never been done where a professor is visiting out being paid by another law school to be the research dean" at Hofstra (*id.*). Prudenti testified that after plaintiff returned, she wanted to resume her role as research dean but "that did not happen" because "Professor Norm Silber had taken over the responsibilities and it was an overwhelming feeling that he had done an excellent job and brought in excellent professors to speak at Hofstra" and that "the faculty wished him, as well as Dean Ku, to continue in that role" (*id.* at 258).

## SUMMARY JUDGMENT STANDARD

"[T]he proponent of a motion for summary judgment must demonstrate that there are no material issues of fact in dispute, and that it is entitled to judgment as a matter of law" (*Ostrov v Rozbruch*, 91 AD3d 147, 152 [1st Dept 2012]). "Failure to make such prima facie showing requires denial of the motion, regardless of the sufficiency of the opposing papers" (*Alvarez v*

157061/2021  MANTA, IRINA vs. Hofstra UNIVERSITY
Motion No. 003

Page 12 of 29

*Prospect Hosp.*, 68 NY2d 320, 324 [1986] [internal citations omitted]). Once a movant has met this burden, "the burden shifts to the opposing party to submit proof in admissible form sufficient to create a question of fact requiring a trial" (*Kershaw v Hospital for Special Surgery*, 114 AD3d 75, 82 [1st Dept 2013]). "[I]t is insufficient to merely set forth averments of factual or legal conclusions" (*Genger v Genger*, 123 AD3d 445, 447 [1st Dept 2014], quoting *Schiraldi v U.S. Min. Prods.*, 194 AD2d 482, 483 [1st Dept 1993]). Finally, evidence must be "construed in the light most favorable to the one moved against" (*Kershaw*, 114 AD3d at 82). Therefore, if there is any doubt as to the existence of a triable fact, the motion for summary judgment must be denied (*Rotuba Extruders v Ceppos*, 46 NY2d 223, 231 [1978]).

## DISCUSSION

### I.    Plaintiff's claims under New York Labor Law § 194

New York Labor Law (NYLL) § 194, also known as New York's Equal Pay Act, states in pertinent part as follows:

> 1. No employee with status within one or more protected class or classes shall be paid a wage at a rate less than the rate at which an employee without status within the same protected class or classes in the same establishment is paid for: (a) equal work on a job the performance of which requires equal skill, effort, and responsibility, and which is performed under similar working conditions, or (b) substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions; except where payment is made pursuant to a differential based on:
>
>    . . .
>
>    (iv) a bona fide factor other than status within one or more protected class or classes, such as education, training, or experience.

NYLL § 194(1) is identical in almost all substantive respects to the federal Equal Pay Act, 29 USC § 206(d)(1), except the New York law was amended in 2016 to require that the "bona fide factor" listed in subsection (iv) be "job-related" with respect to the position in question (*Eisenhauer v Culinary Inst. of Am.*, 84 F4th 507, 524 [2d Cir. 2023]). Despite this

difference, "[a]n equal pay claim under New York Labor Law § 194 is analyzed under the same standards applicable to the federal Equal Pay Act" (*Wu v Good Samaritan Hosp. Med. Ctr.*, 815 F.Appx 575, 580 n.5 [2d Cir. 2020]).

In order to prove a violation of the EPA or NYLL § 194(1), a plaintiff makes out her *prima facie* case by demonstrating: "(1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions" (*id.* at 580-81 [internal quotation marks and citation omitted]). The burden then shifts to the defendant to provide an affirmative defense that the difference in pay was based on "a bona fide factor other than [sex]" if that factor is "job-related with respect to the position in question and . . . consistent with business necessity" (NYLL § 194(1)(iv); *see Moazzaz v MetLife, Inc.*, 2024 WL 1312995 at *6 [SDNY 2024]). Finally, the burden returns to the plaintiff to demonstrate that the justification given by the defendant is "actually a pretext for sex discrimination" (*Fischman v Mitsubishi Chem. Holdings Am., Inc.*, 2023 WL 4763257 at *8 [SDNY 2023]).

## A. Plaintiff cannot make out a *prima facie* case of gender discrimination in salaries

Defendant argues that plaintiff fails to make out her *prima facie* case because she has not submitted proof that female professors as a whole were paid less than male professors (*see* Defendant's Memo of Law [NYSCEF Doc. No. 61] at 12). Contrary to this argument, the Second Circuit has held that "the EPA can be violated even if comparators of one sex as a group are not paid less than comparators of the opposite sex as a group" (*Hatzimihalis v SMBC Nikko Sec. Am., Inc.*, 2023 WL 3764823 at *6 [SDNY 2023] [citing *Lavin-McEleney v Marist College*, 239 F3d 476 (2d Cir. 2001)]). A plaintiff can make out a *prima facie* case by showing simply

157061/2021  MANTA, IRINA vs. HOFSTRA UNIVERSITY
Motion No. 003

Page 14 of 29

14 of 29

that *she* was paid less than similarly situated male comparators (*see, e.g., Lavin-McEleney*, 239 F3d at 482). Regardless, plaintiff in the instant case did not meet this burden.

Plaintiff first argues that she makes out a *prima facie* case of unequal pay by showing that she was paid less than certain male comparators (Plaintiff's Opp. [NYSCEF Doc. No. 127] at 5). Plaintiff argues that "Male Professor A" was paid "between $54,846 and $36,859 more per year than plaintiff for performing equivalent work as a law professor" in the relevant period, and "Male Professor B" was paid "between $15,730 and $10,730 more per year than Manta during the relevant period" (*id.* at 5-6). Plaintiff argues that these comparators were the two lowest-paid male professors at plaintiff's time of hire in 2012 (*id.* at 6). Plaintiff points out that she and "Male Professor A" have "approximately the same amount of experience as law professors," and plaintiff received tenure three years after him (*id.*). Plaintiff argues that she has *more* relevant experience than "Male Professor B" and they were granted tenure the same year (*id.*).

This argument fails because plaintiff cannot make out a *prima facie* case simply by pointing out that she was paid less than certain male comparators in a vacuum without addressing "any factors . . . that affect the wage scale" (*Lavin-McEleney*, 239 F3d at 481). In *Moccio v Cornell University*, the District Court for the Southern District of New York held that the plaintiff "fail[ed] to make out a prima facie case of an EPA violation" when she could not prove that her male comparators were sufficient after taking all relevant factors that may affect pay into account:

> Defendants attest, and Moccio does not dispute, that the main factors used to set the salary of an SEA are the salary negotiated upon the SEA's hire and the employee's annual performance-based increases; additional factors include: years of experience; the level and discipline of the terminal degree; market comparators for people in the same field at different institutions; years of service at Cornell; and specific responsibilities.

**157061/2021 MANTA, IRINA vs. HOFSTRA UNIVERSITY**
Motion No. 003

**Page 15 of 29**

*Moccio v Cornell Univ.*, 889 F.Supp.2d 539, 570-71 [SDNY 2012]. Here, plaintiff highlights the similarities between herself and the selected male comparators such as years of teaching experience and when they received tenure, but disregards both the graduation years of the comparators and the years of their hire at Hofstra which have the main effect on salary discrepancies between faculty members. As plaintiff did not take all factors that "may affect the wage scale" into account, she did not prove that Male Professors A and B are sufficient comparators to make out her *prima facie* case (*Lavin-McEleney*, 239 F3d at 481).

Plaintiff next argues that she can make out a *prima facie* case by comparing her salary to the average salary of all male professors at Hofstra Law School (Opp. at 6). She cites to her expert, Dr. Mark Killingsworth's, report wherein he computes the average salary of all male law professors for each academic year between 2012 (the year of plaintiff's hire) and 2022 (*see* Pl.'s Expert Report [NYSCEF Doc. No. 163], Table 1). Killingsworth then compares that to plaintiff's salary for each of those years (*id.*). Plaintiff argues this shows that "Hofstra paid plaintiff over 40% less than the *average* salary of its male faculty members" (Opp. at 6). This argument fails as well because plaintiff applies the incorrect standard for making out a *prima facie* case using average salaries of comparators. The Second Circuit in *Lavin-McEleney* agreed that:

> the proper test for establishing a prima facie case in a professional setting such as that of a college is whether the plaintiff is receiving lower wages than the average of wages paid to all employees of the opposite sex performing substantially equal work and similarly situated *with respect to any other factors, such as seniority, that affect the wage scale.*

239 F3d at 482 [emphasis added]. *See also Sobol v Kidder, Peabody & Co., Inc.*, 49 F.Supp.2d 208, 219 [SDNY 1999] ["Sobol's comparisons of her salary to those of the average

157061/2021  MANTA, IRINA vs. HOFSTRA UNIVERSITY
Motion No. 003

Page 16 of 29

male with her job title fail to take into account several of the factors Kidder Peabody considers when developing compensation packages"].[2]

Plaintiff's expert's table showing that plaintiff's salary was less than the average salary of all male professors at Hofstra Law School is unpersuasive because it clearly did not take into account each professor's law school graduation year, which affects salaries across the board. On the other hand, the report by defendants' expert Paul White, Ph.D., included analyses that *did* account for the factors that would affect the salary of any given professor in any given year. Namely, White performed statistical analyses that controlled for "time between graduation date and hire date" and "time at Hofstra" (*see* Def.'s Expert Report [NYSCEF Doc. No. 104] at 9-11). White concluded that "Statistical analysis of annual base pay by year that account for Graduation Date and/or Hofstra University School of Law tenure show that there are no statistically significant differences in base pay with respect to gender" (*id.* at 22). As plaintiff's expert did not account for law school graduation year in his analysis, plaintiff has failed to make out a *prima facie* case by comparing her own salary with the average salary of her male colleagues.

Plaintiff's final argument that she has made out a *prima facie* case of gender disparity in pay stems from a chart that compared plaintiff's starting salary at her hire in 2012 to the starting salaries "in 2012 dollars" of four other male comparators (Opp. at 7). Plaintiff argues that her "inflation-adjusted starting salary was $10,000 to $24,500 less than the salaries of men with comparable or fewer years of post-law school experience at the time of hire" (*id.*). The years of hire of the four male comparators range from 1998 to 2009, while plaintiff was hired in 2012

---

[2] It should be noted, and defendant points out, that a table created by Dr. Killingsworth has previously been determined by a district court to be too simple to bolster a plaintiff's case as it did not take into account any other factors that might affect salaries (*Jones v GPU, Inc.*, 234 FRD 82, 96 n.57 [EDPa 2005] ["Dr. Killingsworth states that 'Table 1 shows that average compensation of white employees was always substantially higher than that of black employees.' This statement, however, does not aid plaintiffs' case. Table 1 does not take into account education, age, experience, length of GPU employment, or any number of possible non-discriminatory reasons that overall compensation of African-Americans is less than that of whites"]).

(*id.*). The District Court for the Southern District of New York has held that "Just as an equal pay claim requires a plaintiff to be comparable to the employees of the opposite sex who were paid more than her, the time periods during which each employee was paid those different amounts must be comparable as well." (*Hatzimihalis v SMBC Nikko Sec. Am., Inc.*, 2023 WL 3764823 at *8 [SDNY 2023]). The *Hatzimihalis* court held:

> Given the many legitimate reasons why rates of pay change over time, similar conditions make it equally implausible to infer, from the mere fact that two employees were paid differently at different times, that their employer pays different compensation to the employees of different sexes. Instead, before that inference is justified, a plaintiff must first produce evidence showing that the purported comparator was paid more than she during a time period sufficiently similar with respect to the various factors that influence the compensation employees were paid.

> *Id.* [internal citations omitted].

When following *Hatzimihalis*, plaintiff cannot make out her *prima facie* case by comparing the starting salaries of professors hired over a fourteen-year period. Plaintiff's argument that the court can consider the inflation-adjusted salaries of comparators who worked at different times is rejected by the *Hatzimihalis* court (*see id.* ["In general, a rule of law permitting plaintiffs always to make out a *prima facie* equal pay claim based on any different-year comparison would be overly broad. Disparities in pay over time occur naturally for a variety of reasons, including . . . changes in inflation and the cost of living"]).

As the court has rejected all of plaintiff's arguments and potential comparators, plaintiff did not make out a *prima facie* case of pay discrimination.

**B. Even if plaintiff could make out a *prima facie* case, defendant provides a legitimate, non-discriminatory reason for the pay differences and plaintiff cannot show pretext**

Even assuming plaintiff could make out a *prima facie* case of pay discrimination, her argument fails at the next step of the analysis where the burden shifts to the defendant to provide

**157061/2021   MANTA, IRINA vs. HOFSTRA UNIVERSITY**
Motion No.  003

**Page 18 of 29**

18 of 29

a legitimate, non-discriminatory basis for the pay discrepancy. Defendant's explanation for the pay disparity is that salaries are mostly determined based on law school graduation date which is "a permissible, job-related factor" (Memo at 6). In opposition, plaintiff advances several arguments, none of which establish pretext nor create an issue of fact as to whether Hofstra has provided a legitimate, job-related explanation for the salary differences.

Defendant argues that "Hofstra set faculty members' salaries at hire based on their law school graduation year and where that fell in comparison to other faculty's graduation dates, with other factors allowing for some movement of a few thousand dollars up or down" (Memo at 6). Defendant argues that the factors it uses to determine a faculty member's starting salary are permissible under the NYEPA because "the NYEPA unequivocally lists education, training and experience as examples of bona-fide factors other than sex that may justify a pay differential" (*id.* at 7). Defendant contends that law school graduation date is an indicator of years of experience and "[r]egardless of the type of work an attorney pursues, the number of years of real-world legal experience an individual attains is directly relevant to the level of experience a candidate brings to her role as a law school professor" (*id.* at 8).

In opposition, plaintiff first argues that Hofstra's explanation that salaries are mainly based on graduation year "is disproved by its own documents" (Opp. at 11). Plaintiff points to the memorandum issued by Hofstra general counsel Dolores Fredrich that states the following:

> The Dean takes into account a wide array of factors, including background and experience, stature in the legal community, record of scholarship and other professional accomplishments, subject matter expertise and law school needs at the time of hire, prevailing market conditions, years of teaching experience – all in addition to year of graduation. There is no automatic starting salary tied to year of graduation, which is one of the factors taken into account when establishing salary.

Ex. 29 to Kesselman Aff. [NYSCEF Doc. No. 91].

157061/2021   MANTA, IRINA vs. HOFSTRA UNIVERSITY
Motion No.  003

Page 19 of 29

19 of 29

Plaintiff also points to an email exchange between Fredrich and plaintiff where Fredrich wrote, "there is no set salary scale and no one factor that determines salary" (Ex. X to Mintzer Aff. [NYSCEF Doc. No. 152]). Plaintiff argues the email and memorandum contradict defendant's instant argument that salaries are based on law school graduation year. Despite plaintiff's arguments, the statements are not contradictory. Multiple deans testified that while law school graduation year is the starting point to determine salary, it is not the only factor taken into consideration. Deans Lane and Prudenti testified that factors such as the need and budget of the school, the candidate's resume, and what the candidate could bring to Hofstra are all determinative of a candidate's ultimate starting salary offer (*see* Prudenti Dep. at 50-51; Lane Dep. at 29-32; *see also* Rabinowitz Dep.[3] [NYSCEF Doc. No. 70] at 20). Hofstra has never represented that law school graduation was the *only* factor determinative of faculty members' salaries, and the equal pay laws do not require that only one factor be used in determining salaries in order to be fair and nondiscriminatory (*see e.g., Forden v Bristol Myers Squibb*, 63 Fed.Appx 14, 15 [2d Cir. 2003] [defendant "carried its burden by demonstrating that the salary differentials were due to a number of permissible factors including seniority, experience and performance"] [internal quotation marks omitted]).

Plaintiff unsuccessfully tries to show pretext by pointing to five instances of male professors being paid more than women despite the men graduating the same year or later than the women for two reasons. First, it ignores any other permissible factor, such as tenure at Hofstra, that might have gone into the determination of each professor's annual salary. Again, Hofstra is not arguing that law school graduation is the only determinative factor. Second, it ignores any instance of female professors being paid more than male professors despite

---

[3] Stuart Rabinowitz was the President of Hofstra University at the time of plaintiff's hire but had previously served as the dean of the Law School (Rabinowitz Dep. at 14).

**157061/2021 MANTA, IRINA vs. HOFSTRA UNIVERSITY**
**Motion No. 003**

graduating later, and it fails to refute defendant's expert's analysis that found no statistically significant difference between the salaries of female professors versus male professors.

Plaintiff next argues that discretionary choices both in determining plaintiff's starting salary and each annual salary thereafter contributed to plaintiff's unequal pay (Opp. at 14). This argument fails because plaintiff provides no evidence that the discretion "a few thousand dollars up or down" is not based on the nondiscriminatory factors such as need, budget, experience, or standing in the legal community that have been advanced by the defendant. So long as the reasons provided are legitimate and non-discriminatory, a defendant satisfies its burden under the second step of the NYEPA burden-shifting scheme. Here, Hofstra has done so by advancing factors such as law school graduation year, tenure at Hofstra, budget, and need as reasons why one faculty member's salary may differ from another's (*see, e.g., Wheeler v Citizens Telecom. Co. of New York, Inc.*, 18 AD3d 1002, 1005 [3d Dept 2005] ["The record reveals a variety of factors, including Bentley's superior education, more sales experience, more management experience and previous salary level at the job he was leaving, all of which constitute nondiscriminatory reasons for initially employing him at a greater base salary than plaintiff"]).

As for plaintiff's argument that the salary adjustment given to her and other lower-paid faculty members is proof of Hofstra's knowledge of a pay disparity, knowledge is irrelevant to the strict-liability framework of the equal pay laws (*Ryduchowski v Port Auth. of N.Y. & N.J.*, 203 F3d 135, 143 [2d Cir. 2000]) and it does not help plaintiff in creating an issue of fact. The relevant inquiry is whether defendant can establish a legitimate, nondiscriminatory reason for the pay differences. With respect to the salary increase in 2017, Prudenti testified that she offered it to plaintiff on the basis of her "incredible scholarship" (Prudenti Dep. at 208). Plaintiff does not provide evidence to show that this was pretextual.

**157061/2021   MANTA, IRINA vs. HOFSTRA UNIVERSITY**
Motion No. 003

**Page 21 of 29**

21 of 29

Plaintiff argues next that law school graduation year is not a job-related factor consistent with business necessity as required by the NYEPA (Opp. at 15).[4] Plaintiff argues that this metric "treats all experience equally, no matter if the experience plausibly has any relationship to the work of a law professor" (*id.*). Courts have consistently held that "experience-based compensation [is a] reasonable, gender-neutral business tactic[], and therefore qualify as 'a factor other than sex'" (*Drury v Waterfront Media, Inc.*, 2007 WL 737486 at *4 [SDNY 2007] [quoting *Shieldkret v Park Place Entm't Corp.*, 2002 WL 91621 at *3 (SDNY 2002)]; *see also Forden*, 63 Fed.Appx at 15; *Birchmore v Granville Cent. Sch. Dist.*, 2021 WL 22606 at *5 [NDNY 2021]). Further, it is not plaintiff's place to say that the use of law school graduation year is an ineffective way to measure experience (*see Shands v Lakeland Cent. Sch. Dist.*, 771 Fed.Appx 121, 122 [2d Cir 2019] ["And while Shands argues that her experiences in public education and teaching more broadly are more extensive and valuable than Ruolo's, we do not sit as a super-personnel department that reexamines an entity's business decisions"] [internal quotation marks and citation omitted]; *see also Melman v Montefiore Med. Ctr.*, 98 AD3d 107, 120 [1st Dept 2012] ["[A] plaintiff must do more than challenge the employer's decision as contrary to sound business or economic policy"] [internal quotation marks omitted]).

Finally, plaintiff cannot establish pretext because the evidence shows that Hofstra has been using law school graduation year as a starting point for salaries since before plaintiff was hired. This was first confirmed to plaintiff in an email exchange between her and Ku on March 19, 2012, when plaintiff was attempting to negotiate her starting salary, where Ku wrote:

> I have checked with a couple folks, and they have confirmed that the year of law school graduation thing is a bit rigid, and not something that is easily departed

---

[4] Defendant correctly notes that because the New York State legislature imposed the job-relatedness requirement in 2016, the Court does not need to take this requirement into account when analyzing Hofstra's system for setting salaries before 2016 (*see Eisenhauer*, 84 F4th at 526 n.101). However, as explained here, defendant meets its burden even with the job-relatedness requirement.

**157061/2021  MANTA, IRINA vs. HOFSTRA UNIVERSITY**
**Motion No. 003**

**Page 22 of 29**

22 of 29

from. There are two areas where the Dean might have some room to maneuver, which you might raise. 1) the summer grant for the year before you start is often granted. 2) there is a merit pay component to our annual salary increases…

Ex. 19 to Kesselman Aff. [NYSCEF Doc. No. 81]. Similarly, defendants produced an email from Lane to Ruggilo on March 20, 2012 that states: "We offered Irina I think 124,000. She graduated in 2006. Is that roughly where we should be?" (Ex. 17 to Kesselman Aff. [NYSCEF Doc. No. 79]).

These emails show, first, that law school graduation year is an important starting point for determining the starting salary of each candidate, and second, that the dean does have opportunities to use some discretion in determining salary and other benefits. As this salary scheme has clearly been the case since before plaintiff was hired, plaintiff cannot show that this reason is pretextual and only a cover for discrimination based on her gender. Accordingly, defendant's motion for summary judgment dismissing plaintiff's claims under NYLL § 194 must be granted.

## II. Plaintiff's sex discrimination claims under the New York State Human Rights Law

Plaintiff also claims that the pay disparity constitutes sex discrimination under the New York State Human Rights Law (NYSHRL).[5] In order to state a *prima facie* claim of discrimination under the pre-amendment NYSHRL, a plaintiff must prove "(i) she belongs to a protected class; (ii) she was qualified for the position at issue; (iii) she suffered an adverse employment action; and (iv) the action occurred under circumstances giving rise to an inference of discriminatory intent" (*Garcia v Barclays Capital, Inc.*, 281 F.Supp.3d 365, 374 [SDNY

---

[5] In 2019 the NYSHRL was amended to encourage a more liberal construction. Plaintiff argues that "Because the NYSHRL amendment was effective in 2019, before this case was filed in 2021, it applies here" (Opp. at 1). This is incorrect. The amendment "only appl[ies] to claims that accrue on or after the effective date of October 11, 2019" (*Wellner v Montefiore Med. Ctr.*, 2019 WL 4081898 at *5 n.4 [SDNY 2019]). Because all specific instances of discriminatory animus alleged by plaintiff occurred before the effective date, they will be analyzed under the old NYSHRL standard which is identical to the analysis of federal law claims under Title VII (*Hatzimihalis*, 2023 WL 3764823 at *11; *Moazzaz v MetLife, Inc.*, 2024 WL 1312995 at *6 [SDNY 2024]).

**157061/2021 MANTA, IRINA vs. HOFSTRA UNIVERSITY**
Motion No. 003

**Page 23 of 29**

23 of 29

2017]). The NYSHRL also requires a plaintiff attempting to state a claim based on sex discrimination in pay to show "discriminatory animus or intent" (*Moazzaz*, 2024 WL 1312995 at *6). Alternatively, a plaintiff can make out a *prima facie* NYSHRL claim by "establishing an EPA violation" (*id.*). However, Title VII and NYSHRL discrimination "cannot be inferred" solely based on a plaintiff's contention that she was "paid worse than comparable men" (*Hatzimihalis*, 2023 WL 3764823 at *12).

Most of plaintiff's arguments in opposition fail because they restate her arguments about the existence of a pay disparity that have been rejected in the foregoing section. Since plaintiff did not make out a *prima facie* case for her equal pay claim, the same arguments cannot uphold a *prima facie* case under the NYSHRL.

Plaintiff also cannot establish a *prima facie* case using the four-prong test outlined above because she cannot prove discriminatory animus or intent on the part of Lane or Prudenti. Here, the record shows that a woman (Demleitner) offered plaintiff the original salary while a man (Lane) increased her starting salary to $129,000. Plaintiff's contention that Prudenti's failure to entertain plaintiff's complaints about her low salary constituted an inference of discrimination is undermined by plaintiff's own testimony that Prudenti was receptive to the conversations initiated by plaintiff regarding her salary (Pl. Dep. at 236). Further, Prudenti gave plaintiff a salary increase in 2017 (*id.* at 245).

Plaintiff's only remaining argument that discriminatory animus existed is plaintiff's testimony about three comments made by Dean Lane and two made by Dean Prudenti that plaintiff felt were discriminatory towards her gender. However, these comments are not actionable as they do not relate to gender. First, plaintiff testified that Prudenti displayed discriminatory animus towards her in a conversation in 2022 where she was told faculty

157061/2021  MANTA, IRINA vs. HOFSTRA UNIVERSITY
Motion No. 003

Page 24 of 29

24 of 29

members might think she is assertive (*id.* at 224-228). Next, plaintiff alleges that Lane told plaintiff that he would only support her in her employment until she began interviewing at other schools (*id.* at 140). Further, at one point Lane "spoke to [her] mockingly" in a meeting (*id.* at 141). Finally, plaintiff complained that Prudenti "didn't seem particularly interested" in an event plaintiff put on in conjunction with Northwestern Law School (*id.* at 233) In both her deposition and in opposition to the motion, plaintiff could not relate these comments to her gender.

Plaintiff alleges one comment by Lane that may have been gendered. She testified that in a conversation about plaintiff's salary two years after her hire, Lane complimented her on her hair (*id.* at 137-138). This singular comment is "a classic stray remark that cannot support an inference of discrimination" (*see Crowley v Billboard Mag.*, 576 F.Supp.3d 132, 145 [SDNY 2021]; *see also Melman*, 98 AD3d at 125 [1st Dept 2012] [stray derogatory comments without more do not "constitute evidence of discrimination"]). Any inference of discrimination is "undercut" by the fact that, in the year after Lane allegedly made that comment, he supported plaintiff being the director of the intellectual property center and supported her bid for tenure (*Crowley*, 576 F.Supp.3d at 145 [employer's comment to gay employee that gay people like female artists more was determined to be a stray remark with no discriminatory intent when the same employer was supportive of the employee's promotion several months later]). Plaintiff can point to no specific instance where anyone at Hofstra displayed discriminatory intent or animus or made a discriminatory remark other than the stray remark by Lane. "Furthermore, additional evidence actively undermines an inference of discrimination," such as evidence of plaintiff's later salary increases and plaintiff's own testimony that Prudenti was receptive to her concerns and Lane was supportive of her growth at Hofstra (*Hatzimihalis*, 2023 WL 3764823 at *12).

**157061/2021 MANTA, IRINA vs. HOFSTRA UNIVERSITY**                    **Page 25 of 29**
**Motion No. 003**

[* 25]                                          25 of 29

Even if plaintiff could make out a *prima facie* claim under the NYSHRL, defendants have offered a legitimate, non-discriminatory reason for the pay disparity and plaintiff cannot establish pretext as is outlined in the previous section. Accordingly, plaintiff's sex discrimination claim under the NYSHRL must be denied.

## III.     Plaintiff's retaliation claim

Lastly, plaintiff asserts a claim for retaliation under the NYSHRL. Plaintiff alleges that she was removed from the Research Dean position and not offered it back after she returned from a year visiting at St. John's Law School and argues that this was in retaliation after plaintiff's lawyer sent a letter to Hofstra in December 2018.

In order to establish a *prima facie* case of retaliation under the NYSHRL, plaintiff must show (1) she was engaged in a protected activity, (2) her employer was aware she participated in the activity, (3) she suffered an adverse employment action, and (4) there is a causal connection between the protected activity and the adverse employment action (*Herskowitz v State of New York*, 222 AD3d 587, 587 [1st Dept 2023]; *Hatzimihalis*, 2023 WL 3764823 at *13). To prevail on a motion for summary judgment in a retaliation case a defendant must "demonstrate that the plaintiff cannot make out a prima facie claim of retaliation or, having offered legitimate, nonretaliatory reasons for the challenged actions, that there exists no triable issue of fact as to whether the defendant's explanations were pretextual" (*Shapiro v State of New York*, 217 AD3d 700, 702 [2d Dept 2023] [internal quotation marks and citation omitted]).

Defendants argue that plaintiff cannot make out a *prima facie* case because she cannot establish a causal connection between the letter from plaintiff's lawyer and her removal from the position of Research Dean at the end of the 2018-2019 academic year (Memo at 21). Plaintiff argues that the three-month period between December 2018 when her lawyer sent the letter

**157061/2021   MANTA, IRINA vs. HOFSTRA UNIVERSITY**
Motion No.  003

**Page 26 of 29**

26 of 29

alleging discrimination and March 2019 where Prudenti and Ku informed plaintiff she could not continue her role of research dean when visiting at St. John's established sufficient temporal proximity to infer causation (Opp. at 20-21). "[T]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was followed closely in time by the adverse action" (*Summa v. Hofstra Univ.*, 708 F3d 115, 127-28 [2d Cir 2013] [internal citations omitted]). Further, the First Department has held that a four-month period "easily falls within the acceptable temporal range to establish causation" (*Herskowitz*, 222 AD3d at 588).

Despite plaintiff's arguments to the contrary, the adverse action of removing plaintiff from the Research Dean position did not actually occur until the end of August 2019 because plaintiff was able to finish out the 2018-2019 academic year in that role. In March 2019 plaintiff told Ku and Prudenti that she would be accepting a visiting professor position at St. John's, and in response, she was simply informed by Ku and Prudenti that she would be unable to continue as Research Dean if she were to accept the visiting professor position for the next academic year (Pl. Dep. at 316-17). As such she cannot establish temporal proximity between the letter and her removal from the position nine months later and cannot make out a *prima facie* case of retaliation.

Even if the court were to consider the "adverse action" to be the March 2019 conversation and determined that plaintiff has made out a *prima facie* case of retaliation, defendant has offered a legitimate, nonretaliatory reason for removing plaintiff from the position of Research Dean, and plaintiff cannot offer any evidence besides speculation to show that the reason was pretextual. Defendant's argument that plaintiff was removed from the position because she was visiting at another institution is a legitimate and nonretaliatory reason that is

157061/2021   MANTA, IRINA vs. HOFSTRA UNIVERSITY
Motion No. 003

Page 27 of 29

[* 27]

27 of 29

supported by the record. First, plaintiff was told several months in advance of the removal that she would be unable to continue as research dean if she decided to visit at another law school. Prudenti and Ku testified that this is because it would be difficult to serve as Research Dean while visiting at another school (Prudenti Dep. at 257; Ku Dep. at 285-286). Further, Prudenti testified that there have been no instances that she could remember where a professor served as Research Dean at Hofstra while visiting at another institution (*see* Prudenti Dep. at 257). Plaintiff herself testified that she knew of no instance where a professor visiting at another institution was able to hold the position of Research Dean at Hofstra (Pl. Dep. at 318; *cf Delrio v City of New York*, 91 AD3d 900, 902 [2d Dept 2012] ["[P]laintiff raised triable issues of fact as to whether the defendants' reasons were pretextual. In particular, the plaintiff submitted an affirmation from his immediate supervisor wherein she stated that a reassignment of the plaintiff violated FDNY internal procedure as well as known past practice"]). Here, plaintiff provided no evidence of pretext besides speculating that she could have completed the duties of Research Dean while visiting at St. John's (Opp. at 21).

Plaintiff also argues that she was retaliated against when she returned from visiting at St. John's and was not offered back the research dean position. Plaintiff cannot establish a *prima facie* case regarding this adverse action because the December 2018 letter cannot be temporally linked to the decision to not reinstate her in 2020 or 2021. Plaintiff also argues that around this time she filed a complaint with the EEOC, but this is not stated in the complaint in this lawsuit and is mentioned only in passing in her opposition to the instant motion (Opp. at 22). In any event, even if plaintiff could establish a *prima facie* case on these facts, defendant offered legitimate reasons for refusing to reinstate her; namely, that no one held the position due to the pandemic in 2020, and in 2021 Norm Silber—who had taken over the role and had done "an

**157061/2021   MANTA, IRINA vs. HOFSTRA UNIVERSITY**
Motion No. 003

**Page 28 of 29**

[* 28]

28 of 29

excellent job" when plaintiff was at St. John's—resumed the Research Dean role (Prudenti Dep. at 258; Reply [NYSCEF Doc. No. 199] at 14). Plaintiff provided no evidence to show that this reason was pretextual. Accordingly, plaintiff's retaliation claims must be dismissed.

## CONCLUSION

Accordingly, it is

ORDERED that defendant's motion for summary judgment dismissing plaintiff's complaint is granted. The clerk shall enter judgment accordingly.

| | | |
|---|---|---|
| **11/1/2024** | | |
| DATE | | SHLOMO S. HAGLER, J.S.C. |

| CHECK ONE: | X | CASE DISPOSED | | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|
| | X | GRANTED | ☐ DENIED | ☐ GRANTED IN PART | | ☐ OTHER |
| APPLICATION: | ☐ | SETTLE ORDER | | ☐ SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | ☐ | INCLUDES TRANSFER/REASSIGN | | ☐ FIDUCIARY APPOINTMENT | | ☐ REFERENCE |

**157061/2021  MANTA, IRINA vs. HOFSTRA UNIVERSITY**
**Motion No. 003**

**Page 29 of 29**